**UNITED STATES COURT OF APPEAL**
**for the Fifth Circuit**

_____

**No. 92-7685**
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FRANCISCO CASTANEDA-CANTU, and
JOSE ANTONIO TIQUET-RIVERA

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern  District of Texas
_____
(May 4, 1994)

Before KING and WEINER, Circuit Judges, and DOHERTY,[1] District
Judge.

PER CURIAM:

### Procedural History

On March 10, l992, a grand jury returned a twenty-five (25)
count indictment against appellants, Francisco Castaneda-Cantu
("Castaneda") and Jose Antonio Tiquet-Rivera ("Tiquet"), and
thirteen (13) others in the Houston Division of the United States
District Court for the Southern District of Texas.  The sixty-
five (65) page, twenty-five (25) count indictment stemmed from a
government-sponsored "sting" operation involving the laundering

---

[1]  District Judge for the Western District of Louisiana,
sitting by designation.

of funds through Mexico money exchange houses known as "Casas de Cambio" with funds represented by the federal law enforcement officers to have been proceeds of unlawful narcotics and firearms trafficking.

In Count One, all defendants were charged with conspiring to launder money in violation of 18 U.S.C. § 371. Castaneda was specifically charged in Counts Two, Three, Five, Seven through Thirteen, Fifteen, Sixteen and Eighteen with money laundering in violation of §§ 1956(a)(3) and (2). In Counts Twenty and Twenty-one Castaneda was charged with failure to file Reports of International Transportation of Currency or Monetary Instruments ("CMIR") in violation of Title 31 U.S.C. § 5316(a)(l)(A). Tiquet was specifically charged in Counts Two, Three, Four, Six, Fourteen and Seventeen with money laundering in violation of 18 U.S.C. §§ 1956(a)(3) and (2). In Count Twenty-five, Tiquet was charged with possessing Methaqualone with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(l)(C). Prior to trial Tiquet pled guilty only to Count Twenty-five, possessing Methaqualone with intent to distribute.

Although the Grand Jury returned the Indictment in the Houston Division of the Southern District of Texas, the district court found that none of the defendants, government witnesses or events alleged in the indictment had any relation to the Houston Division of the court and transferred the case on a joint defense

2

motion to the McAllen Division.  The district judge in McAllen, Texas recused himself from hearing the case and it was subsequently transferred to the Corpus Christi Division of the court.  The case was finally transferred to the Brownsville Division of the court, the Honorable Filemon B. Vela presiding, where it was tried to a jury.  Trial began on July 8, 1992 and continued through July 31, 1992.  On July 29, 1992, the jury convicted Castaneda of fourteen (14) of the sixteen (16) counts in which he was charged, including Count One - the conspiracy charge, and acquitted him of the two (2) counts of failing to file Reports of International Transportation of Currency or Monetary Instruments ("CMIR") pursuant to Title 31 U.S.C. § 5316(a)(1)(A).  The jury convicted Tiquet of all the remaining counts in which he was charged, including Count One - the conspiracy charge.

On October 9, 1992, the district court sentenced Castaneda to 60 months on Count One and 108 months on each of the other counts, all to run concurrently, a three (3) year term of supervised release on each count, to run concurrently, and $700.00 in special assessments.  The court also sentenced Tiquet to 60 months on Count One and 120 months on each of the other counts, all sentences to run concurrently, a three (3) year term of supervised release on each count, to run concurrently, and $400.00 in special assessments.

## **Facts**

The charges of money laundering against Francisco Castaneda-Cantu ("Castaneda") and Jose Antonio Tiquet-Rivera ("Tiquet") were the result of an investigation lasting approximately two (2) years by the United States Custom Service in McAllen, Texas of the importation of large sums of U.S. currency into the United States from Mexico by the representatives of Casa de Cambio Colon.  In July of 1989, Special Agent Vincent Iglio of the United States Customs Service noticed the Casa de Cambio Colon was transporting millions of U.S. dollars on a weekly basis into McAllen, Texas via the McAllen airport and was completing the required Report of International Transportation of Currency or Monetary Instruments ("CMIR") which reflected that the couriers carried money on behalf of Casa de Cambio Colon.  The money was then transferred to various accounts across the United States. Although businesses such as Casa de Cambio's ostensibly made their profit from trading on the exchange rate between the United States dollar and the Mexican peso, the agents suspected, based on the volume of cash, that the money actually was booty which had been smuggled into Mexico from an illegal activity in the United States and was being "laundered" by the Casa de Cambio Colon to appear to be the proceeds of trading on the dollar/peso exchange rate.

The Customs Service consequently initiated a complex and

4

costly undercover investigation into the importation of the U.S. currency.  Two (2) Custom Service undercover agents were involved in the operation.  The first, Ventura Cerda, known undercover as Vincente Serna, posed as a drug and weapons trafficker to see whether the Casa de Cambio Colon would agree to launder money. Special Agent J.J. Munoz, known undercover as Jessie Martinez, joined Agent Cerda in the operation.

Agents Cerda and Munoz set up an undercover operation in which they established three (3) businesses which appeared on the surface to be legitimate.  The three (3) were Choza Rica Exports, Archer Enterprises and Impex Enterprises.  Bank accounts at First City Texas Bank, McAllen, Texas and Barkley's Bank U.K. London, England were opened.  Agent Cerda testified that he played the role of a drug and weapons smuggler, posing as a representative of a criminal organization that needed to launder the proceeds of its illegal narcotics trafficking and weapons smuggling.

On October 26, 1989, Special Agent Ventura Cerda telephoned the office of Casa de Cambio Colon in Monterrey, Mexico and spoke to Rogelio Rodriguez, the owner of the Casa de Cambio Colon, regarding their money laundering services.  Subsequently, Agent Cerda discussed the possibility of money laundering with Rodriguez.  Although Rodriguez was hesitant to become involved, he eventually agreed to make a referral to another person who could take care of the "dirty money."  Rodriguez also inquired

what percentage Agent Cerda was willing to pay for the laundering service.

On February 4, 1991, Agent Cerda received a telephone call from Francisco Castaneda-Cantu, who identified himself as an employee of the Casa de Cambio Libra in Monterrey. Castaneda indicated that Rodriguez had instructed him to call Agent Cerda concerning Cerda's money problems. This led to a meeting in Rio Grande City, Texas, on February 5, 1991, between Agent Cerda, Castaneda, Tiquet and Gonzalez (also a defendant). At this meeting, Tiquet identified himself as the owner of Casa de Cambio Libra while Gonzalez represented himself to be the attorney for the Casa de Cambio Libra. A deal was struck wherein the three (3) agreed to launder money for Agent Cerda at the following commission rates: 5% for $50,000.00 to $75,000.00, 4% for over $75,000.00 to $150,000.00 and 3% for over $150,000.00. Agent Cerda testified that he told the trio the monies were the proceeds of illegal narcotics trafficking and weapons smuggling. Shortly after this meeting, Rodriguez telephoned Cerda to confirm he referred Tiquet, Castaneda and Gonzales and to vouch for their abilities.

On February 19, 1991, the first in a series of money laundering transactions began. On that day, Agent Cerda met with Tiquet and Hector Espinoza, also a defendant, at Pendergrass Electronics in McAllen, Texas. The money was laundered under the

6

following plan:  Tiquet and Espinoza met Agent Cerda at a location in McAllen, Texas, received the U.S. currency, and telephoned Castaneda in Mexico to confirm the receipt of the money.  Castaneda then wire transferred an amount of money equal to the amount received by Tiquet and Espinoza from the accounts of the Casa de Cambio Colon in the First City Bank of Texas, to undercover accounts given by Agent Cerda.  Tiquet and Espinoza were then to either smuggle the cash received from Agent Cerda across the Mexican border or deposit it into the accounts of Casa de Cambio Colon at the First City Texas Bank.  Castaneda generated a fictitious receipt for the money which indicated that the wire transferred money originated from a pesos for dollars exchange in Monterrey, Mexico.  This scheme created a paper trail that made it appear as if the money going into Agent Cerda's account originated from a pesos for dollars exchange in Monterrey, Mexico rather than from illegal activities in the United States.  For these services Tiquet, Castaneda and Espinoza charged Agent Cerda a fee as per the rates described at the initial meeting.

From February 19, 1991 until February 13, 1992, a number of transactions, which were detailed in the indictment, took place involving Tiquet and Castaneda as well as the other 13 defendants named in the indictment.  These transactions took place in "out of the way" locations and Tiquet and Castaneda received a substantial fee for each money laundering transaction based on

7

the amount of money laundered. Defendants, Castaneda and Tiquet, were subsequently indicted by the grand jury in a twenty-five (25) count indictment on March 10, l992 and subsequently convicted on July 29, l992 after a nineteen (19) day jury trial.

Castaneda and Tiquet both moved for a Judgment of Acquittal at trial pursuant to Rule 29(b)[2] of the Federal Rules of Criminal Procedure, at both the close of the government's case and at the conclusion of all evidence. Their motions were based upon the government's alleged failure to prove beyond a reasonable doubt that Castaneda or Tiquet knew or believed that the money being laundered was the proceeds of illegal drug or weapons trafficking sales. Each argued that he believed the money in question came from a variety of sources including "the exchange of furniture, cars, warehouse, and all" the sale of televisions, Mayan figures and artifacts from Guatemala, stolen tires, heavy equipment, used telephones and "refrigerators and those machines." The court denied both motions pursuant to FRCP 29(b) and the case was subsequently presented to the jury who found sufficient evidence to convict both Castaneda and Tiquet on multiple counts.

---

[2] Although unclear after a thorough review of the record and briefs filed by each defendant, this court will assume for purposes of this appeal that both defendants' motions pursuant to Fed. R. Civ. Pro. 29(b) on sufficiency of the evidence applied only to the substantive counts charged, and not to Count One based on 18 U.S.C. § 371, conspiracy.

## Discussion

Castaneda and Tiquet appeal the decision of the jury in this case, as well as certain rulings made by the district court, and appeal the sentences that the district court imposed. We will address each argument that Castaneda and Tiquet raise on appeal.

Castaneda and Tiquet first contend that the district court erred in failing to grant their FRCP 29(b) motion, arguing the government presented insufficient evidence to prove beyond a reasonable doubt that Castaneda and Tiquet knew the money being laundered was the product of specified unlawful activity, in this case, illegal drug or weapons sales. This Court's standard of review of the district court's denial for a Motion for Judgment for Acquittal, pursuant to Federal Rule of Criminal Procedure 29(b), is de novo. United States v. Restrepo, 994 F.2d 173, 182 (5th Cir. 1993). "The well-established standard in the circuit for reviewing a conviction allegedly based on insufficient evidence is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." Id. We review the evidence in the light most favorable to the government to determine whether the government proved all elements of the crimes alleged beyond a reasonable doubt. United States v. Skillern, 947 F.2d 1268, 1273 (5th Cir. 1991), cert denied 112 S.Ct. 1509 (1992). In such a review, the evidence does not have to exclude every reasonable hypothesis of

9

innocence.  United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1993), cert denied 113 S.Ct. 2971 (1993).

To convict the defendants of a violation of 18 U.S.C. § 1956(a)(3) as charged in Counts Two - Nineteen, requires that the government prove beyond a reasonable doubt that the defendants:  (1)  conducted or attempted to conduct a financial transaction; (2)  involving property represented by a law enforcement agent to be the proceeds of specified unlawful activity; (3)  with the intent to conceal or disguise the nature, location, source, ownership, or control of the property; and (4) believed the  proceeds were the product of a specified unlawful activity.  United States v. Fuller, 974 F.2d 1474, 1478 (5th Cir. 1992) cert denied ____ U.S. ____, 114 S.Ct. 112 (1993); United States v. Arditti, 955 F.2d 331, 339 (5th Cir.) cert denied, ____ U.S. ___, 113 S.Ct. 599 (1992).  Pursuant to §§ 1956(c)(7)(A) and (D) both drug trafficking and weapons smuggling are specified unlawful activities.

Tiquet and Castaneda challenge the sufficiency of the evidence with regard to the second and fourth elements of 18 U.S.C. § 1956(a)(3), which are logically inter-related.  More specifically, defendants challenge whether the laundered money was represented by the agents to be the proceeds of specified unlawful activity and whether both defendants believed the proceeds were from those sources.

10

The only issue for review before this Court on this challenge made by defendants is whether the government introduced sufficient evidence to prove that Agent Cerda represented to defendants, and that defendants believed the funds they were laundering were the proceeds of a specified unlawful activity. The specified unlawful activity involved in this case was the sale and distribution of narcotics and dangerous drugs and the illegal sale, importation and exportation of weapons.

## Sufficiency of the Evidence

The essence of defendants' argument is that Agent Cerda represented too much. Defendants claim that Agent Cerda presented himself as a smuggler *in general* rather than a trafficker *only* in specified unlawful activities. Defendants claim that he represented that there were multiple sources of the funds to be laundered, including but not limited to: televisions, Mayan figures and artifacts from Guatemala, stolen tires, heavy equipment, used telephones, etc. Therefore, defendants argue the record does not support what the government alleges defendants ultimately believed about the "nature" of the proceeds sought to be laundered through the Casa de Cambio Colon.

The government contends that the only sources of funds ever discussed with the defendants were the proceeds of drug

trafficking and weapons smuggling.  Further, the government argues that the record reveals that the argued references to other sources of funds were taken out of context by defendants and those references merely referred to possible legitimate sources which could have been used to show that the money from the various transactions originated in Mexico.

Defendants further argue that Agent Cerda used ambiguous terms with double and triple meanings and never directly stated that he was in the business of either illegal sales of drugs or weapons or both.  Defendants argue specific terms were never used rather only very general terms such as "Italians", "contrabandista" and "marihuano" were used, which defendants argue are general terms which could mean a variety of things depending on the part of the country from which you come. However, at trial Agent Munoz testified that he had lived in the Rio Grande Valley all his life and the term "contrabandista" meant someone who smuggles drugs.  Agent Cerda testified "marihuano" could mean someone who sells or smokes marijuana.

Defendants argue the general term "contrabandista", used by Agent Cerda to imply smuggling guns and drugs or both, also could apply to smuggling many items such as electronics, or clothing and this coupled with Agent Cerda's assertions about the source of the funds is insufficient as a matter of law to prove either that the proceeds laundered were the proceeds of illegal drug

12

sales or illegal weapon sales or that either Castaneda or Tiquet knew or believed that he was laundering these types of funds.

Law enforcement agents do not have to make *express* representations that the funds to be laundered were proceeds of specified unlawful activity. "It is enough that the government prove that an enforcement officer or other authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds." United States v. Kaufmann, 985 F.2d 884, 893 (7th Cir.), cert denied, __ U.S. ____ 113 S.Ct. 2350 (l993). Further, this Court notes that when evaluating the representations made by law enforcement agents, language used by a law enforcement agent that might be ambiguous to a person unfamiliar with illicit activity may not be ambiguous to a person involved in an illicit activity. United States v. Breque, 964 F.2d 38l, 387 (5th Cir. l992), cert denied, ____ U.S. ____ 113 S.Ct. 1253 (l993).

The facts surrounding this issue of the case were testified to at trial in great detail by Agent Cerda and Agent J.J. Munoz, and through some 200 tape recorded conversations by and between the undercover agents and the defendants. The record is replete with testimony which refutes defendants' assertions that they were not aware of the source of the money sought to be laundered by Agent Cerda. Cerda testified that in the first face-to-face meeting with defendants on February 5, l99l, he told both Tiquet

13

and Castaneda that he was the "middle man for certain individuals, for the Italians, as a matter of fact, that were involved in the smuggling of arms and narcotics into and out of the United States."

Subsequently, in two (2) meetings in February of 1991, Agent Cerda told Tiquet that, "these men work -- they work in real big amounts -- real big -- they're -- they're in a little of every thing, [unclear] be it weed, I mean, arms or what . . ." Agent Cerda further told Tiquet that, "these Italians, this of -- of guns, they're fine [unclear] . . . There's going to be many, well they're smugglers of the first kind . . . Nothing but guns." Agent Cerda told Tiquet that his clients have "some arms . . . Automatic ones. That I know well that they're hot, understand me?"

On May 21, 1991, while traveling in Agent Cerda's car, Agent Cerda discussed with Castaneda and another defendant charged in the indictment, that Agent Cerda's clients trafficked in weapons. Agent Cerda then stopped to show Castaneda and the other defendant two (2) assault rifles, an AK-47 and an M-16.

On June 4, 1991, Castaneda introduced Agent Cerda to David Torres-Sancedo, who was also charged in the indictment. During this meeting Agent Cerda explained that his clients were "marijuana dealers" and later told Castaneda he had access to M-

14

16s in "big amounts." On June 5, l99l, Agent Cerda told Castaneda that his clients "move a tremendous amount of -- they're in arms . . . ." On December 26, l99l, Castaneda called Agent Munoz, and during the course of the conversation, Agent Munoz referred to his clients as "dopers." On January 3, l992, Agent Munoz met with Castaneda and twice referred to his clients as "dopers" and told Castaneda that Agent Cerda's clients dealt in weapons such as rifles and machine guns. A bit later in the conversation Castaneda told Agent Munoz he wanted a gun. Consequently, a jury could have reasonably inferred that Castaneda believed the monies to be laundered were the proceeds of illegal drug and weapon trafficking.

Further testimony reveals that Tiquet discussed supplying and actually sold narcotics to Agent Cerda. Tiquet told Agent Cerda that "we move a lot of pills" referring to the Mandrex pills and further discussed the possibility of selling Agent Cerda one (l) ton of cocaine. On February 4, l992 Tiquet sold Agent Cerda 1,000 Mandrex pills for $2,000.00.

From these transactions and Agent Cerda's testimony a jury could reasonably infer that Tiquet also believed Agent Cerda's representations that the money to be laundered was from a specified illegal activity, i.e., illegal drug sales and illegal gun sales or both.

15

Law enforcement agents involved in "sting" operations are not required under § 1956(a)(3) to describe the source of funds to be laundered before each money laundering transaction. This court in Arditti, 955 F.2d at 339 held:

"To hold that a government agent must recite the alleged illegal source of each set of property at the time he attempts to transfer it in a 'sting' operation would make enforcement of the statute extremely and unnecessarily difficult; 'legitimate criminals,' whom undercover agents must imitate, undoubtedly would not make such recitations before each transaction."

Lastly, the context in which all of these representations were made is not to be discounted. The record reflects that either Tiquet, Castaneda or both defendants took steps to ensure that the money provided to them by Agent Cerda appeared to originate from a pesos for dollars exchange in Mexico. In order to create this impression the cash was transported to Mexico, money was wire transferred to Agent Cerda's undercover accounts and fraudulent facts and documents were created purporting to evidence a pesos for dollars exchange in Mexico. The meetings between the undercover agents and the defendants took place in "out of the way locations", and Tiquet and Castaneda both received a substantial fee for each money laundering transaction. Therefore, the service Tiquet and Castaneda were providing and

16

the circumstances under which it was being provided also could have contributed to a reasonable person's inferring that the monies laundered were the proceeds of illegal drug and weapons sales. <u>Kaufmann</u>, 985 F.2d at 893 (7th Cir.), 113 S.Ct. 2350 (1993).

Therefore, we find that the record contains sufficient evidence for a reasonable jury to have found that the defendants believed the funds they were transferring were the proceeds of a specified illegal activity, i.e., illegal drug or firearm sales or both.

## Multiple Conspiracy Instruction

Both Castaneda and Tiquet claim that the district court committed reversible error by failing to give the requested Fifth Circuit Pattern Jury Instruction for Multiple Conspiracies[3] and therefore, conviction on Count One for both Castaneda and Tiquet must be reversed.

---

[3] The requested jury instruction was as follows: <u>Multiple Conspiracies</u>: You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it. If you find that the conspiracy charged in the indictment did not exist, then you must return a verdict of not guilty, even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy. See: United States Fifth Circuit District Judges' Association, Pattern Jury Instructions - Criminal Cases (1990), at 92.

The basis of both Castaneda's and Tiquet's argument is that because Castaneda conducted certain transactions without Tiquet's knowledge, there was necessarily more than one (1) conspiracy and therefore, the district court committed reversible error by not giving the requested instruction. We disagree.

Further, both defendants contend that because there was no Multiple Conspiracy instruction given and the district court gave a Pinkerton[4] instruction,[5] the convictions on the money laundering counts are necessarily "tainted." Again, we disagree.

Both defendants were indicted in Count I for participating in a *single* conspiracy to launder funds represented by government agents to be the proceeds of illegal narcotics and weapons

---

[4] Pinkerton v. United States, 328 U.S. 640, 647-48 (1946).

[5] The court instructed the jury - Now, with respect to the substantive count. Remember, Count One is not a substantive count, that's a conspiracy. I'll tell you a conspirator is responsible for a conspiracy by his fellow conspirator if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of the conspiracy. Therefore, if you first found (sic) that the defendant that you have under consideration guilty of the conspiracy charged in Count One, if you first find the defendant that you have under consideration is guilty of Count One and if you find beyond a reasonable doubt that while he was a member of that conspiracy his fellow conspirators committed the offense that you have under consideration in the substantive counts in furtherance of or as a foreseeable consequence of that conspiracy, you may find him guilty of the count that you have under consideration even though he may not have participated in any of the acts that constitutes the acts in all of the Counts Two through Nineteen. See: United States Fifth Circuit District Judges' Association Pattern Jury Instructions - Criminal Cases (1990) at 93.

18

trafficking.  However, both of the defendants argue that the record contains evidence that numerous separate conspiracies developed between the agents, Tiquet, Castaneda and various other defendants named in the indictment.  In particular, Castaneda argues that a separate conspiracy developed when Castaneda agreed to go behind Tiquet's back to launder funds supplied by Agent Cerda, such that by April, 1991, Castaneda was in competition with Tiquet to launder Agent Cerda's funds.  Therefore, Castaneda in particular, argues that the post-April, 1991 agreements to launder Agent Cerda's funds among Castaneda and other parties were not part of the overall conspiracy charged in Count One. The government argues that there was one (1) and only one (1) overall conspiracy, that both defendants were party to this overall conspiracy, and regardless of who was actually laundering the money, when or how, the goal of the overall conspiracy remained the same:  laundering Agent Cerda's money for a fee. Defendants' particular objections will be addressed separately.

## **Tiquet**

Tiquet requested an instruction on Multiple Conspiracies and therefore, the standard of review for failure to give the requested instruction is abuse of discretion.  <u>Arditti</u>, 955 F.2d at 339.  This Court has repeatedly held that "a defendant is entitled to a Multiple Conspiracy instruction if he specifically and timely requests such an instruction and his theory has legal

and evidentiary support."  United States v. Stowell, 947 F.2d 1251, 1258 (5th Cir. l991) cert denied, 112 S.Ct. 1269 and cert denied, 113 S.Ct. 292 (1992).

A multiple conspiracy instruction "is generally required where the indictment charges several defendants with one (l) overall conspiracy, but the proof at trial indicates that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Greer, 939 F.2d 1076, 1088 (5th Cir. l991) (quoting United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir.) cert denied, ll0 S.Ct. 416 (1989)) (emphasis added), opinion reinstated in part by 968 F.2d 433 (5th Cir. 1992) (en banc), cert denied, 113 S.Ct. 1390 (l993).  As Tiquet timely requested a multiple conspiracy instruction, this Court will review only whether Tiquet's assertion has any evidentiary support within the record.

Tiquet was not involved in the "behind the back" transactions which Castaneda claims formed a separate conspiracy and is the basis for Castaneda's argument that a Multiple Conspiracy instruction should have been given by the Court. Rather, Tiquet argues that there are numerous examples of the agents and the defendants operating behind the backs of each other, in separate schemes to launder money.  As previously stated, Count One of the indictment charged an overall conspiracy

20

to launder the funds of the agents involved in the government "sting" operation. The remaining substantive counts of the indictment charge and name Tiquet only as a participant in those substantive counts in which he directly participated. Tiquet, does not argue that evidence introduced at trial showed that he was involved only in a separate non-charged conspiracy and not in the overall conspiracy charged in Count One. Further, Tiquet was not convicted on any substantive count other than those substantive counts in which he was named and in the overall conspiracy charged in Count One. The record does not support Tiquet's argument that he was not involved in the overall conspiracy but in other non-charged conspiracies. Consequently, this Court finds the failure to give the requested instruction was not an abuse of discretion and therefore, does not require a reversal.

## Castaneda

Castaneda along with a Mr. Alaniz elected to go, in the government's words, "behind Tiquet's back" and developed separate deals to launder Agent Cerda's funds, with various other parties. However, *Castaneda did not request* the Multiple Conspiracy instruction, <u>supra</u>. Accordingly, the standard of review as to Castaneda is plain error. <u>United States v. Barakett</u>, 994 F.2d 1107, 1112 (5th Cir. 1993), <u>cert denied</u> 114 S.Ct. 701 (1994).

Castaneda's argues he did request the instruction as he

argues the district court ruled that defendants could "piggy back" onto jury instructions requested by co-defendants. In support, Castaneda cites the district court's statement that "What adheres to the benefit of one (l) defendant will adhere to the benefit of all defendants". However, in reviewing the complete record, we find the portion of the district court's statement quoted by defendant is not complete and is taken out of context. When viewed *in toto* and in context it is clear the cited statement applied to motions of co-defendants and not to requested jury instructions.[6]

---

[6] The language cited by defendant is not complete and is taken out of context. The complete statement of the district court is as follows:

> There are several motions filed in this case. We will take up motions filed, as we have them listed for each respective defendant.

> As with regard motions that will adhere to the benefit of all defendants, there have been several of you who have filed motions to that effect, that will be granted. What adheres to the benefit of one (l) defendant will adhere to the benefit of all defendants.

> One ruling of the Court should likewise affect you accordingly and, if not, you tell me why not when we get there.

Record Vol. 9, page 7.

Much later when addressing the question of jury instructions, the district court stated:

> Remember that if you have favored me with any requested instructions and had them filed that you don't have to object to anything I do inconsistent therewith. You preserve your exception in there (sic) regard. You can object to anything further that you see fit to so do. Fair?

Record Vol. 32, p. 1215.

Under the plain error standard, only error "which when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of the judicial proceedings" requires reversal (quoting United States v. Vontsteen, 950 F.2d 1086, 1092 (5th Cir.) (en banc), cert denied _ __ U.S. ____, 1122 S.Ct. 3039 (1992)).

In essence, Castaneda argues that because there was evidence introduced at the trial of a separate transaction involving Castaneda and others, it was error for the district court to refuse to instruct the jury on Multiple Conspiracies. Castaneda argues this separate transaction was a separate conspiracy and therefore, the Multiple Conspiracy charge was required. This Court disagrees. The government charged an overall conspiracy in Count One and the substantive acts in the latter counts. Castaneda does not argue that the evidence introduced at trial showed that he was involved only in a separate non-charged transaction and not in the overall conspiracy charged in Count One. Castaneda does not refute the fact that he might have been involved in the charged overall conspiracy, at least before April, 1991, he merely argues he also was involved in the separate transactions charged in the counts representing the substantive acts which comprised the conspiracy. Such a situation does not require a Multiple Conspiracy charge on a plain error review. Consequently, this Court finds the failure

23

to give the requested instruction was not plain error.  It was "not so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings" and therefore, does not require a reversal.

## Pinkerton Instruction

Both Castaneda and Tiquet argue that if the court failed to properly instruct the jury on multiple conspiracies, it would logically follow that the substantive offense convictions, based on Pinkerton, are "tainted."  As we have found that the district court did not err in refusing the request for a Multiple Conspiracy instruction, and after reviewing the record as a whole, this Court finds the district court's giving of a Pinkerton instruction does not rise to the level of plain error or an abuse of discretion and, in fact, the Pinkerton instruction was essentially superfluous.  We, therefore, cannot say that the district court erred in its refusal to give a Multiple Conspiracy instruction to the jury or in its giving of a Pinkerton instruction.

## **Sentencing Guideline Issues**

A sentence imposed under the Federal Sentencing Guidelines will be upheld unless a defendant can demonstrate that it was

imposed in violation of the law, was imposed because of an incorrect application of the guidelines, or was outside the range of applicable guidelines and is unreasonable.  United States v. Parks, 924 F.2d 68, 71 (5th Cir. 1991).

The district court's sentence will be upheld on appeal so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous.  United States v. McCaskey, 9 F.3d 368, 372 (5th Cir. 1993).

The finding will be clearly erroneous when the reviewing court is left with a definite affirmed conviction that a mistake has been committed.  United States v. Shaw, 894 F.2d 689, 691 (5th Cir. 1990).

Further, a sentencing court's factual findings must be supported by a preponderance of the evidence.  Id.  We review the issues de novo, United States v. Soliman, 954 F.2d 1012, 1013 (5th Cir. 1992).

Both Castaneda and Tiquet argue that the district court clearly erred in increasing each defendants' base level offense by three (3) in accordance with § 2S1.1(b)(1) of the Federal Sentencing Guidelines which provides:

25

Specific Offense Characteristics:

(1)  If the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by three (3) levels.

As this Court found that a reasonable jury could have found beyond a reasonable doubt that both Castaneda and Tiquet knew or believed that the source of the money being laundered was the result of either illegal drug or weapons sales, consequently, the district court did not err when it found that each defendant could be assessed an increase of three (3) levels in his base offense level pursuant to § 2S1.1(b)(1) of the Federal Sentencing Guidelines.

Secondarily, defendants argue that the application of U.S.C. § 2S1.1(b)(1) violates the expo facto clause of the Constitution.

A sentencing court must apply the version of the guidelines effective at the time of sentencing unless application of that version would violate the Ex Post Facto Clause of the Constitution.  United States v. Mills, 9 F.3d 1132, 1136 n. 5 (5th Cir. 1993).

The Federal Sentencing Guidelines were amended in 1991 to

26

include § 2S1.1(b)(1) and this circuit held in <u>United States v.</u>
<u>Breque</u>, 964 F.2d 381, 389 (5th Cir. 1992) that the three (3)
level "sting" adjustment provided in § 2S1.1(b)(1) was a
substantive change in the guidelines that could not apply to pre-
November 1, 1991, conduct and belief.

This Court notes, however, that in the case of both
defendants, each was charged with at least one (1) count
subsequent to the November 1, 1991 inclusion in the guidelines of
§ 2S1.1(b)(1).[7]

The district court "grouped" the money laundering counts
together in accordance with United States Sentencing Guidelines,
§ 3D1.3(d)[8] and in accordance with 18 U.S.C. § 3553(a)(4).[9]

---

[7] Tiquet, charged in Count XVII for activity on January 9,
1992 and Castaneda, charged in Count XV for activity on December
20, 1991, Count Sixteen, on January 3, 1992 and Count Seventeen
on January 10, 1992.

[8] Groups of closely related counts. All counts involving
substantially the same harm shall be grouped together into a
single Group. Counts involve substantially the same harm within
the meaning of this rule: (d) when the offense level is
determined largely on the basis of the total amount of harm or
loss, the quantity of substance involved or some other measure of
aggregate harm, or if the offense behavior is ongoing or
continuous in nature and the offense guideline is written to
cover such behavior.

Offenses covered by the following guidelines are to be
grouped under this subsection: Section 2S1.1.

[9] 18 U.S.C. § 3553(a)(4) states:

Imposition of a Sentence:

27

Accordingly, we AFFIRM the district court's assessment of a three (3) level increase pursuant to § 2S1.1(b)(1) of the Federal Sentencing Guidelines and therefore, AFFIRM the district court's sentence of both defendants.

## Conclusion

Finding no error, we AFFIRM the district court on all issues raised on appeal.

---

(a)   Factors to be considered in imposing a sentence – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider

(4)   the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(1) and that are in effect on the date the defendant is sentenced . . .