**UNITED STATES of America, Appellee,**

v.

**Billy WYDERMYER, Defendant,**

**Thomas Honton and Jermon Carter, also known as "Jerry Carter," also known as "Dr. Carter," Defendants–Appellants.**

**Nos. 137, 198, Dockets 93–1845, 93–1846.**

United States Court of Appeals,
Second Circuit.

Submitted Oct. 13, 1994.

Decided March 14, 1995.

---

Paul P. Rinaldo, Forest Hills, for defendant-appellant Thomas Honton.

Harold J. Pokel, New York City, for defendant-appellant Jermon Carter.

Tanya Y. Hill, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., and Peter A. Norling, Asst. U.S. Atty., of counsel), for U.S.

Before: NEWMAN, Chief Judge, WALKER, and CALABRESI, Circuit Judges.

WALKER, Circuit Judge:

Thomas Honton and Jermon Carter appeal from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York (Edward R. Korman, *Judge*) for (1) conspiracy under 18 U.S.C. § 371 to conduct a financial transaction involving property represented by a law enforcement officer to be proceeds of criminal violations of the Arms Export Control Act, 18 U.S.C. § 1956(a)(3)(B), and to make false statements to the government in violation of 18 U.S.C. § 1001, and (2) attempting to conduct a financial transaction involving property represented by a law enforcement officer to be proceeds of criminal violations of the Arms Export Control Act, 18 U.S.C. § 1956(a)(3)(B).[1]

Carter raises three claims on appeal: (1) there was insufficient evidence that, as required by 18 U.S.C. § 1956(a)(3)(B), the government made an explicit representation that the proceeds came from specified illegal activity, or that he engaged in a "financial transaction" within the meaning of the money laundering statute; (2) the indictment failed to state elements of the offense on both counts and should be dismissed; and (3) Congress did not intend "sting" legislation to apply to first-time offenders. Honton makes two arguments on appeal: (1) the indictment should be dismissed for the defects alleged by Carter and (2) there was insufficient evidence that he knowingly participated in a money laundering conspiracy.

## I. BACKGROUND

March 12, 1992 was a fateful day for Jermon Carter. On that day, he received a phone call from Eugene Forster, an old business associate. Unbeknownst to Carter, Forster had recently been arrested by the

---

1. Unless otherwise indicated, all statutory citations are to the United States Code (1988 & Supp. III 1991).

United States government for conspiring to launder money derived from arms smuggling. Following his arrest, Forster entered into a cooperation agreement with the government whereby he would pursue any "ongoing relations" with his erstwhile accomplices in order to set up a sting operation. During the phone call, which the government recorded, Forster reminded Carter of their previous conversation about "switching ... soft money to hard money," which, Forster explained at trial, was a well-known financial services colloquialism for getting money recorded in or through a bank. Forster asked if Carter still had those contacts. Carter said that he would check to see if he did and asked how much money was involved. Forster replied that the trial run would involve "a hundred grand," with more in the offing once they made the company that provided the money "comfortable." The two men then discussed a "situation" in which the two of them had been formerly involved where the "money ... didn't show up," to their mutual disappointment.

Two hours after the conversation, Carter sent Forster a fax confirming his interest in the scheme. On March 16, 1992, in another recorded conversation, Carter told Forster he had a foolproof method for converting the cash. The scheme involved an Italian diplomat who would take the money into a private plane owned by an Italian bank. The client who supplied the money would also fly in the plane but would never handle the money. When the plane landed, a representative of the bank would pick up the diplomat and the client and deposit the funds. Carter said that his contacts would charge a fee of 25 percent of the money laundered for their service, to which his cut of $50,000 would be added. Moreover, to make the transaction worthwhile to his contacts, it had to involve at least a million dollars. When Forster balked, Carter admonished him,

> [Y]ou don't want to do this more than ... once a year.... I mean ... this is serious.... [T]his bank has contacts right here in the embassy.... [T]his is the Italian embassy ... that's going to be ... routing money, and they don't want to mess with a dime, you know?

And though "presumably the money was clean," Carter advised Forster that Forster's client would be paying for the "guarantee of services" of working with the Italian diplomatic corps and that "[t]hey could handle it even if it was dirt."

In April of 1992, Carter sought to buff his image with Forster. In a recorded conversation, he bragged of deals he had done with the Italian government involving transactions of forty and sixty million dollars, and assured Forster that the contacts he was planning to use for the cash conversion were "major hitters" who had just closed a two-hundred million dollar deal.

On May 5, 1992, Forster placed another recorded call to Carter to set up a meeting between his clients and Carter's contacts. Forster asked Carter whether one of Carter's people knew that this was a "money laundering situation," and Carter cautioned him not to use that expression since the phones might be tapped.

The first meeting between the purported clients and the Carter group took place in New York on May 27, 1992. Forster introduced U.S. Customs Service Special Agent Dennis Doyle, posing as Dennis Dolan, and Agent Joe King, posing as Joe Kennedy, as representatives of his client, Kennedy and Associates. Carter in turn introduced his coconspirators, Lorenzo Mazza and codefendant Billy Wydermyer. Doyle explained that his group got its money from arms sales and needed help getting the money out of the country, and Wydermyer outlined the planned laundering scheme. Negotiations, which were captured in a series of recorded telephone conversations, continued between Agent Doyle and the coconspirators, and it was eventually agreed that Carter's group would launder two million dollars for Kennedy and Associates.

In mid-June, Carter sent a fax to Forster outlining an alternative to the elaborate scheme involving the Italian banks and diplomats. The new proposal was for Carter to secure the services of one "Tom," who, according to Carter, was "an internationally-registered CPA" with "diplomatic immunity for [transporting between countries] up to two million dollars ... in cash or securities."

In a later conversation, Wydermyer confirmed to Agent Doyle that the CPA's full name was Tom Honton.

The sting culminated on June 30, 1992, at the Marriott Hotel at LaGuardia Airport in New York. Agents Doyle and King attended, as did Carter, Wydermyer, Mazza, and Honton. Honton explained that he would declare the two million dollars as business revenues belonging to BFD Limited, a Cayman Islands corporation he had organized. Honton explained elliptically that Customs could not "touch" him because his corporation had a "thirty-year exemption," and he had diplomatic immunity in the Cayman Islands. When Agent King inquired about whether Honton had a diplomatic passport, Honton retreated, saying that he had "business immunity, [which is] like ... diplomatic immunity" but preferable after a recent crackdown on diplomatic money laundering. Agent Doyle then asked if Honton had been involved in any previous transactions, and Wydermyer assured him, "Tom was in a ... transaction that would make this deal look like shit, excuse the expression. We had an airplane with, uh, fifty million dollars on it." The agents and the conspirators then discussed the mechanics of ultimately depositing the funds in a bank in Monte Carlo, and then having the funds transferred to Kennedy and Associates' Swiss bank account. The conspirators promised that "Prince Ranier" would take care of Agent Doyle's hotel arrangements in Monte Carlo, if need be.

As the conversation progressed, Agent Doyle explained that he needed to complete the transaction as quickly as possible. He said that he had an arms deal pending, and that he needed to get the money out of the United States fast to avoid "screw[ing] up the people who are purchasing the weapons in the United States here." Agent Doyle continued,

> So for this first shipment, we'd like to send the two million dollars out using this route. We'll get it over there, we'll smuggle the weapons in and we'll take care of the distribution in and we'll take care of the distribution on that.... In four weeks, which is going to be the second shipment

that we talked about, it's four million dollars that we have to get out.

The parties discussed how money from the next arms shipment would be handled. At the end of the meeting, the agents gave the defendants the money to count. The defendants were arrested after they had counted $100,000 of the money.

Following a jury trial, defendants-appellants Carter and Honton were convicted on both counts. Defendants argued entrapment to the jury, but the jury rejected that defense.

The district court sentenced each defendant to a probation term of five years, with the special condition that each spend ten months in a halfway house or community treatment facility.

## II. DISCUSSION

### A. *Sufficiency of the Indictment*

Defendants challenge both counts of the superseding indictment for failing to state elements of the charged offenses. Count One charged that the defendants

> did knowingly and willfully ... conspire ... to commit certain offenses against the United States, namely:
>
> (i) conducting a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, to wit, criminal violations of the Arms Export Control Act, with the intent to conceal and disguise the nature, location, source, ownership and control of said property, in violation of Title 18, United States Code, Sections 1956(a)(3)(B); and
>
> (ii) making false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the United States ..., in violation of Title 18, United States Code, Section 1001.

Count Two of the indictment charged defendants with "knowingly and willfully attempt[ing]" to commit the money laundering offense specified as the first object offense of the conspiracy count.

Defendants argue that both the conspiracy and attempt counts are defective because they omit two elements of the charged mon-

ey laundering offense: (1) that the proceeds were "believed to be the proceeds of specified unlawful activity" by the defendants, *see* 18 U.S.C. § 1956(a)(3)(B), and (2) that a "financial transaction," as defined in 18 U.S.C. § 1956(c)(4), must affect interstate or foreign commerce. Defendants also claim a defect in the second object offense of the conspiracy count: namely, that it does not specify that the defendants "knowingly and willfully" made false statements, as required by 18 U.S.C. § 1001. Because the indictment must be read liberally in the circumstances of this case, we find these claims to be without merit.

At common law, even the slightest technical defect might fell an indictment. Sir Matthew Hale lamented the strictness with which indictments were viewed as "a blemish and inconvenience of the law" whereby "heinous and crying offenses escape by these unseemly niceties to the reproach of the law, to the shame of the government, and to the encouragement of villainy, and to the dishonour of God." 2 Sir Matthew Hale, *The History of the Pleas of the Crown* 193 (London, E. Rider 1800) (1716). In 1883, Sir James Stephen opined that the exacting scrutiny of indictments for technical error made the administration of justice "a solemn farce," a condition only partly alleviated by various statutory reforms in his time. 1 Sir James F. Stephen, *A History of the Criminal Law of England* 284, 284–92 (Lenox Hill (Burt Franklin) 1973) (1883). Stephen found one saving grace in the technical rigidity of the law of indictments, namely, that the requirement that an indictment set out all the elements of the offense was "some sort of security against the arbitrary multiplication of offences and extension of the criminal law by judicial legislation in times when there were no definitions of crimes established by statute, or indeed by any generally recognized authority." *Id.* at 293. Sir William Holdsworth noted two others. First, the law of indictments subjected prosecutions by the crown to the same rules of formality and technicality applied to private appeals of felony, thus guaranteeing that the law would be enforced against the crown and forestalling arbitrary exercises of power. Second, it preserved the idea that the crown must prove its

case and helped to engrain in the common law the presumption of innocence. 3 W.S. Holdsworth, *A History of English Law* 620 (3d ed. 1923).

■ Such justifications for technical rigidity in reviewing indictments have largely disappeared in an age of criminal codes and well settled burdens of proof. The modern rule, as stated by the Supreme Court, is that "[c]onvictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused." *Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 996, 3 L.Ed.2d 1041 (1959). Indictments are now reviewed for constitutional infirmities, most notably whether the alleged defect offends the Sixth Amendment right of the accused to be informed of the charges against him, the Fifth Amendment right not to be prosecuted without indictment by a grand jury, *Russell v. United States,* 369 U.S. 749, 760–61, 82 S.Ct. 1038, 1045–46, 8 L.Ed.2d 240 (1962), or the Fifth Amendment protection against double jeopardy, *see Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932).

■ The scrutiny given an indictment also depends on the timing of the defendant's objection. *See United States v. Thompson,* 356 F.2d 216, 225–26 (2d Cir.1965), *cert. denied,* 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966). The defendants here did not challenge the indictment before or during trial; the alleged deficiencies were noticed *sua sponte* by the district court nearly six months after the verdicts were rendered. In such a case, we interpret the indictment liberally in favor of sufficiency, absent any prejudice to the defendant. In *Thompson,* the indictment omitted the essential element of "intent to steal" from the federal bank robbery statute. *Id.* at 225. Although we stated that the indictment "certainly was defective" and should have been dismissed had an earlier motion been made, *id.* at 226, we found no reversible error since the challenge was first made in a motion in arrest of judgment and no prejudice was shown:

The claim came too late. Technically, a claim that the indictment does not charge an offense may be raised on a motion in

arrest of judgment and such motion was made in time here. [*See* Fed.R.Crim.P. 12(b)(2).] But the courts of the United States long ago withdrew their hospitality toward technical claims of invalidity of an indictment first raised after trial, absent a clear showing of substantial prejudice to the accused—such as a showing that the indictment is so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had.

*Id.* (quotation omitted); *United States v. Fistel,* 460 F.2d 157, 161 (2d Cir.1972) (quoting *id.*).

The defendants here cannot fairly claim that any of what the Supreme Court has termed the " 'notice' related concerns" of the law of indictments, *United States v. Miller,* 471 U.S. 130, 135, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985), are implicated in this case. The defendants were not "prejudicially surprised," *id.* at 134, by the claimed omissions of elements of the offense in violation of the defendants' Sixth Amendment rights to notice of the charges, nor was the indictment so vague as to prevent defendants from pleading it in the future as a bar to subsequent prosecutions in violation of the Fifth Amendment Double Jeopardy Clause. *See id.* at 134–35, 105 S.Ct. at 1814. The only colorable issue that might involve prejudice to substantial rights here is whether, in violation of the Fifth Amendment, the defendants were tried on charges upon which a grand jury had not passed. *See Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

■ Liberally construed, this indictment adequately set forth the charged offenses to the grand jury. We turn first to Count Two, which charged an attempt to commit the offense of money laundering under 18 U.S.C. § 1956(a)(3)(B). Count Two does not track the language of the statute since, as defendants point out, it does not expressly charge that they believed the funds were proceeds of specified unlawful activity. The count does charge, however, that the defendants "did knowingly and willfully attempt" to commit the money laundering offense. Under the circumstances of this appeal, we think that the knowledge alleged in the count fairly conveyed to the grand jury that the defendants believed that the money laundered came from specified unlawful activity, namely, violations of the Arms Export Control Act.

■ The defendants also claim that Count Two is tarnished by its failure to specify that the illicit financial transaction affected interstate or foreign commerce. Because the interstate commerce requirement is found not in § 1956(a)(3)(B), but in the definitions section of the statute, 18 U.S.C. § 1956(c)(4), it is not clear that the government was bound to charge an effect on interstate commerce in the indictment. Even assuming that the government was so bound, we think Count Two sufficed in this regard. The indictment specifically alleged that the financial transaction involved property represented to be the proceeds of criminal violations of the Arms Export Control Act. Since a transaction involving illegal international arms sales necessarily affects interstate or foreign commerce, the indictment gave adequate notice of that element.

■ Count One, which charged a conspiracy to launder money and make false statements to the government, was also adequately pled. "It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy...." *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301–02, 71 L.Ed. 545 (1927); *see also United States v. Switzer,* 252 F.2d 139, 142 (2d Cir.), *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958). The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed. *See United States v. Werme,* 939 F.2d 108, 112 (3d Cir.1991), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992) (quotation omitted). The indictment need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense, *id.,* or in the context relevant here, apprise the grand jury in essential terms of the

object of the conspiracy. Thus, to prevail on their belated claim that the conspiracy count was insufficient, defendants must show that the indictment, liberally construed, was not "sufficient to identify the offense which the defendant conspired to commit," *Wong Tai,* 273 U.S. at 81, 47 S.Ct. at 302 (quotation omitted).

Under this standard, Count One easily passes muster. Defendants allege the same deficiencies—the failure to allege the requisite belief as to the source of the proceeds or an effect on interstate or foreign commerce—in Count One with regard to the first object offense of the conspiracy, the money laundering offense of § 1956(a)(3)(B), that they do for the attempt offense of Count Two. As discussed above, those deficiencies are insignificant, and in any event did not leave the grand jury in the dark as to the identity of the offense that the defendants conspired to commit. Defendants' claim as to the second object offense of making false statements to the government is equally unavailing. Defendants urge that the indictment is invalid since it omits the requirement under 18 U.S.C. § 1001 that the defendants "knowingly and willfully" made a false statement to the government. But Count One charges defendants with "knowingly and willfully conspiring" to make a false statement, and thus undoubtedly conveyed to the grand jury the allegation that the defendants had the knowledge and intent that the statement be false. Repetition of the "knowingly and willfully" language of § 1001 would have been surplusage. Here too, the indictment was more than adequate to inform the grand jury and defendants of the identity of the object offense of the charged conspiracy. It was therefore sufficient in all respects.

## B. *Sufficiency of the Evidence*

■ Both defendants claim that the evidence was insufficient to sustain their convictions on either the attempt or conspiracy charges. In reviewing the sufficiency of the evidence, we draw all inferences in favor of the government, *United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.), *cert. denied,* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991), in order " 'to determine whether the record evi-

dence could reasonably support a finding of guilt beyond a reasonable doubt.' " *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (footnote omitted).

### 1. Jermon Carter

Carter argues that the evidence was insufficient in two respects: first, the evidence did not show that he attempted or conspired to engage in the type of "financial transaction" outlawed by 18 U.S.C. § 1956(a)(3) and (c)(4), and, second, the evidence did not show that a law enforcement officer explicitly represented the money to be laundered as proceeds of specified unlawful activity, as required by § 1956(a)(3).

#### a. Financial Transaction

■ Carter contends that the planned physical transportation of money out of the United States by hand was not a "financial transaction" within the meaning of § 1956(a)(3) and (c)(4), which in his view encompass only commercial transactions. Moreover, he argues that the planned deposit of the transported funds in a European bank could not have constituted a financial transaction since the statute only covers domestic banks.

The plain language of the statute answers Carter's argument. The term "financial transaction" is defined in the statute applicable at the time of the offense as

(A) a transaction (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, which in any way or degree affects interstate or foreign commerce, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

18 U.S.C. § 1956(c)(4). The term "transaction" is defined broadly to include

a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution include[ ] a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any . . .

monetary instrument, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

*Id.* § 1956(c)(3).

The transaction contemplated and attempted by the conspirators fits within both categories of "financial transaction" specified in § 1956(c)(4)(A). It was a movement of funds by "other means" than by wire. *Id.* § 1956(c)(4)(A)(i). It was also a transaction "involving one or more monetary instruments," *id.* § 1956(c)(4)(A)(ii), since the term "transaction" is defined to include a "delivery, or other disposition," *id.* § 1956(c)(3), and the term "monetary instruments" is defined to include currency of the United States, *id.* § 1956(c)(5). Carter's claim that he did not engage in a financial transaction within the meaning of the statute is baseless.

### b. Explicit Representation

■ Carter also contends that the evidence is insufficient to show that a law enforcement officer represented the property to be proceeds of unlawful activity specified in 18 U.S.C. § 1956(c)(7), as required by 18 U.S.C. § 1956(a)(3). Here, to conform to the indictment, the law enforcement officer had to represent that the proceeds derived from criminal violations of the Arms Export Control Act, 22 U.S.C. §§ 2751–2796(d). *See* 18 U.S.C. § 1956(c)(7)(D). Carter notes the distinction between the money laundering offense of § 1956(a)(3), which requires that the property be represented "to be the proceeds of *specified* unlawful activity" by a law enforcement officer or his agent (emphasis added), and that of § 1956(a)(1), which requires only that the defendant know that "the property involved in a financial transaction represents the proceeds of *some form of* unlawful activity" (emphasis added). Carter argues that the heightened specificity required by § 1956(a)(3) serves to protect the innocent from abuse of the "sting power" that Congress granted to law enforcement agencies. He alleges that neither the Customs agents nor Forster, acting with their authorization, explicitly represented that the proceeds derived from criminal violations of the Arms Export Control Act.

Courts have held that § 1956(a)(3) does not require that law enforcement agents explicitly represent that the money or property being laundered derived from an offense specified in § 1956(c)(7). *See United States v. Castaneda–Cantu,* 20 F.3d 1325, 1331 (5th Cir.1994); *United States v. Kaufmann,* 985 F.2d 884, 893 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993). In *Kaufmann,* the Seventh Circuit noted that a "representation" is "[a]ny conduct capable of being turned into a statement of fact." *Id.* at 892 (quoting *Black's Law Dictionary* 1301 (6th ed. 1990)). It found no indication that Congress intended to require express statements of the illegal source of the funds being laundered. To require such a recitation would be too costly in the verisimilitude vital to sting operations. *Id.* In *Kaufmann,* the agents never explicitly told the defendant that the money was drug proceeds; they only told the defendant that a marijuana dealer was interested in buying a Porsche with cash, and that he wanted the car titled in someone else's name. *Id.* at 893. The Seventh Circuit found those representations sufficient, holding that "[i]t is enough that the government prove that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds." *Id.*

In *Castaneda–Cantu,* which involved an arms smuggling sting operation similar to this one, the undercover agent represented to defendants that he was " 'the middle man for certain individuals . . . that were involved in the smuggling of arms and narcotics into and out of the United States.' " He also made numerous other statements indicating that his clients were major arms traffickers. 20 F.3d at 1331–32. In weighing these statements and the clandestine arrangements made by the defendants to launder the money, the Fifth Circuit held that a reasonable jury could find that the agents represented and the defendants believed that the "funds they were transferring were the proceeds of a specified illegal activity, i.e., illegal drug or firearm sales or both." *Id.* at 1332.

It is unnecessary for us to say how far we would go in embracing *Kaufmann* and *Castaneda–Cantu.* Whether a representation

that a client is involved in a specified illegal activity for which he needs money laundered sufficiently conveys that the money is derived from that activity is a fact-specific determination. Here, though, the evidence established a direct nexus between the funds and specified illegal activity. On June 30, 1992, Agent Doyle expressly indicated that the two million dollars that Carter's group was to launder came from the first shipment of arms, and that another four million dollars would soon need to be laundered from the second shipment of arms which was being smuggled into the country. Because smuggling arms into the United States is an activity addressed by the criminal provisions of the Arms Export Control Act, see, e.g., 22 U.S.C. § 2778(b) (setting forth registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and services); id. § 2778(c) (defining criminal penalties for violation of §§ 2778–79); cf. United States v. Hendron, 43 F.3d 24 (2d Cir.1994) (per curiam) (defendant convicted of unlawfully importing into the United States defense articles on the United States Munitions List in violation of 22 U.S.C. § 2778(b)(2)), we think the evidence was sufficient to show that a law enforcement officer represented that the funds came from specified unlawful activity, as required by 18 U.S.C. § 1956(a)(3).

### 2. Thomas Honton

■ Honton contends that the evidence was insufficient to show that he believed that the money came from specified unlawful activity or that he knowingly participated in a money laundering conspiracy. Honton points out that he was not a party to any of the numerous recorded conversations between Forster or the Customs agents and the other alleged co-conspirators, and that he did not attend the meeting of May 27, 1992. He says he only appeared at the June 30, 1992, meeting and presented a way to declare the money in compliance with the law.

The record shows otherwise. Honton was present at the meeting when Agent Doyle made the critical representation that the conspirators were to launder the proceeds of arms smuggling. Falsely claiming "business immunity," Honton elaborated a scheme to spirit the funds out of the country in the guise of business revenues belonging to his Cayman Islands corporation, BFD Limited. He discussed other methods to avoid detection for future transactions. The jury was also told that, after his arrest, Honton admitted that he believed his planned statements to Customs would have been illegal. Taken together, the evidence was clearly sufficient for the jury to infer that Honton believed Agent Doyle's representation that the money derived from specified unlawful activity and knowingly participated in the money laundering conspiracy.

### C. Statutory Exemption

■ Finally, Carter argues that Congress never intended the sting power granted in 18 U.S.C. § 1956(a)(3) to be used against ordinary citizens who had not previously engaged in such conduct. We reject this claim. The statute contains no exemption for first-time offenders. To the extent that the government "seduce[d] honest businessmen into agreeing to launder money," as Carter claims in his brief, the defendants were entitled to argue entrapment to the jury. They did in fact raise an entrapment defense, but the jury rejected it. The absence of any evidence that Carter engaged in prior money laundering activities does not render his conviction invalid.

The judgment of the district court is therefore affirmed.