**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 96-20563**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee/Cross-Appellant,**

**versus**

**JOSEPH PANKHURST,**

**Defendant-Appellant/Cross-Appellee.**

_____

**Appeals from the United States District Court
for the Southern District of Texas**
_____

July 21, 1997

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The principal issue at hand is whether, prior to a *sua sponte* downward departure, the district court must give FED. R. CRIM. P. 32 pre-sentencing notice to the Government. Joseph Pankhurst appeals his conviction under 18 U.S.C. § 201(b)(1)(A) for "corruptly giv[ing] ... [$10,000] to [a] public official ... with ... intent ... to influence [an] official act"; he challenges both the jury instruction describing the "official act" ("acceptance of an offer by [Pankhurst] to purchase a loan being sold ... by the Resolution Trust Corporation") and the sufficiency of the evidence, especially concerning his corrupt intent. The Government cross-appeals from the downward departure, in part because it was not given notice. We **AFFIRM** the conviction, but **VACATE** and **REMAND** for resentencing.

Pankhurst and his wife owned Atlas Oil Company. In early 1992, Pankhurst, through Atlas Oil, acquired Jetera Fuels Terminaling Corporation for only $2,500. But, Jetera was burdened with a $5.6 million debt on two loans from TexasBanc Savings (TBS), with monthly payments of approximately $60,000 and with Jetera's property as security. TBS had failed prior to Atlas Oil's acquisition of Jetera; the TBS loans were managed by the Resolution Trust Corporation (RTC), which, *inter alia*, had the power to foreclose on Jetera's property in event of default.

In mid-1992, although Jetera was not in default on either loan and was profitable, Pankhurst, as chairman of Jetera, requested that the RTC consolidate the loans and reduce the principal to $1.75 million. The RTC responded that the loans had been grouped with others for sale, and that their terms could not be negotiated then. Later that year, Jetera defaulted on the loans.

In response to the default, the RTC advised Pankhurst that it would order an appraisal and environmental assessment of Jetera. Pankhurst, again on behalf of Jetera, again requested loan consolidation and reduction.

In June 1993, Pankhurst, *now on behalf of Atlas Oil Company*, offered to the RTC to purchase for $500,000 either the Jetera property or the Jetera loans. In response, Ronnie Hooks, a contract employee for the RTC who was acting as senior asset manager for TBS, met with Pankhurst at the RTC's offices in Houston, Texas.

Hooks advised Pankhurst at the meeting that the RTC had received competing offers for the property securing the loans; that Jetera's appraised value was approximately $800,000; that the RTC was receiving approximately 70% of the appraised value for similar properties; and that, therefore, if Pankhurst increased his offer from $500,000 to $560,000, it *might* be accepted. Pankhurst increased his offer accordingly. And, later in the discussions, Pankhurst placed a stack of cash on the table. At this meeting, Hooks informed Pankhurst that he did not have the authority to accept Pankhurst's $560,000 offer to the RTC; in addition, he neither accepted nor rejected Pankhurst's offer of cash.

Concerning the cash placed on the table, Pankhurst testified that he had asked if an attorney would be necessary, and whether Hooks knew anyone willing to act as a consultant during the negotiations with the RTC; that he stated to Hooks that he had seen advertisements about former RTC employees offering to work as consultants; that he opened his briefcase in order to show Hooks such an advertisement, *stating that he had seen about "ten of these"*; and that some cash also happened to be in the briefcase, because he was about to make a deposit and, therefore, a deposit slip was bound to the top of the cash. On the other hand, Hooks testified that he understood the "ten of these" comment to be a reference to ten similar piles of cash.

Hooks reported Pankhurst's actions concerning the cash to the RTC. An investigation ensued, with Hooks assisting the FBI. In recorded telephone conversations, Hooks and Pankhurst discussed

different documents Pankhurst would have to submit to the RTC, and the amount of Hooks' "consulting fee", which they set at $10,000.

During these recorded conversations, Hooks told Pankhurst that he did not want to meet at obvious places. They met at a hotel; Pankhurst then took Hooks to Pankhurst's car.

At the car, Hooks, wearing a recording device, stated that he had more work to do to get Pankhurst the deal he wanted from the RTC; that he had been afraid when Pankhurst first approached him about the deal in the RTC offices; and that, within a few days, he could obtain acceptance of Pankhurst's offer to the RTC.

At that point, Pankhurst said that he would pay Hooks half of the $10,000 then and the other half when his offer to the RTC was accepted. He handed Hooks a binder labeled "corporate records"; the binder contained cash. Pankhurst gave Hooks part of the cash and said he would keep the rest in the trunk of his automobile.

Hooks delivered to the FBI the binder received from Pankhurst. It contained $5,000 in cash.

At Hooks' request, the two men met two days later at the same hotel. Again, Hooks was wearing a recording device and they met in Pankhurst's car. Pankhurst handed Hooks a letter offering $560,000, a settlement document, and a $2,000 earnest money check. In turn, Hooks gave Pankhurst a letter accepting the offer, and explained that Atlas Oil would be the purchaser and that the transaction would probably close by the end of the month. When Hooks asked about job opportunities, Pankhurst suggested that Hooks

work for him.  Pankhurst also gave Hooks the second $5,000 in a brown manila envelope, telling him to "put this in your briefcase".

Pankhurst was arrested at the subsequent, videotaped meeting he was instructed to attend to close the transaction.  He was convicted by a jury of bribery of a public official, a violation of 18 U.S.C. § 201(b)(1)(A).  Pankhurst's motions, during and after trial, for judgment of acquittal were denied, as was his motion for new trial.

At sentencing, consistent with the recommendation in the Presentence Report, the Government urged a guidelines sentencing range of 51 to 63 months.  Instead, the district court, without having given Rule 32 pre-sentencing notice of a possible downward departure, ruled that the guidelines did not apply adequately to Pankhurst's offense and ordered a downward departure.  Because of the resulting low offense level, and the fact that Pankhurst was a first offender, probation was a sentencing option.  Pankhurst was placed on probation for one year (with home confinement) and fined $50,000.  The sentence was stayed pending appeal.

## II.

Pankhurst challenges the description for the "official act" used in the jury charge and claims there was insufficient evidence for conviction, in part because of a claimed failure to prove corrupt intent.  The Government challenges the downward departure, contending in part that it made a sufficient objection at sentencing about not being given notice of a possible departure.

A.

Pankhurst's one count indictment contained two possible grounds for conviction. He was charged with violating subparts (A) and (B) of 18 U.S.C. § 201(b)(1), which proscribes:

> [d]irectly or indirectly, corruptly giv[ing], offer[ing] or promis[ing] anything of value to any public official ... with intent ...
>
> (A) to influence any official act; or
>
> (B) to influence such public official ... to commit or aid in committing ... any fraud ... on the United States....

18 U.S.C. § 201(b)(1). But, the court did not submit subpart (B) (fraud) to the jury as a possible basis for conviction. Accordingly, the only possible basis for conviction was an intent "to influence an official act" (subpart (A)), *not* an intent to effect a fraud on the United States (subpart (B)).

Accordingly, the court instructed the jury that it could return a guilty verdict only if it found, beyond a reasonable doubt, both that Pankhurst "directly or indirectly gave, offered or promised $10,000 to Ronald Hooks, a public official"; and that Pankhurst "did so corruptly [defined for the jury as "done intentionally with an unlawful purpose"], with intent to influence an official act by a public official". The "official act" was defined as the act described in the indictment; therefore, the pertinent portion of the indictment was included then in the charge:

> Pankhurst, did directly and indirectly corruptly give, offer, and promise ... $10,000 ... to a public official, namely Ronald Hooks[,] ... with the intent to influence an

official act and to influence a public official, namely Ronald Hooks, to commit and aid in committing a fraud upon the United States. That is the acceptance of an offer by the defendant to purchase a loan being sold to the public by the Resolution Trust Corporation.[1]

The court's proposed charge had not contained a definition or description of the "official act" in issue. At the earlier charge conference, in his objections to that proposed charge, Pankhurst's counsel had contended, in a very general way, that the court should add such a definition or description. But, other than referring to the language in the indictment, Pankhurst's counsel did not offer a definition. And, when the court stated that the description in the indictment would constitute the definition for the "official act", Pankhurst's counsel did not object to the inclusion of the fraud language also contained there. Restated, he did not request that the fraud language be redacted. In fact, he agreed to the indictment, which included the fraud language, being used as the description or definition of the official act.

Now, however, on appeal with different counsel, Pankhurst asserts that the court committed reversible error in its "official act" instruction. Pankhurst complains that, instead of granting his "request[] ... [to] instruct the jury specifically what they must find as the 'official act'", the court used the indictment for that purpose. Likewise, he complains, most belatedly, that the

---

[1] Concerning the difference in punctuation surrounding "that is" in the last sentence of the above-quoted transcribed charge and in the indictment, see note 2, *infra*.

indictment contained language concerning fraud as a possible aim of the payment to Hooks, making conviction on the fraud element possible, even though the court refused to submit that element to the jury. In the alternative, Pankhurst urges, again most belatedly, that, because the fraud language was left in, it should have been defined.

But, again, Pankhurst did not object to the inclusion of the fraud language, nor to the failure to define fraud, when the court opted to use the indictment to describe the official act. As noted, Pankhurst had, however, requested earlier that the court define the official act. On the other hand, as also noted, he did not provide or suggest a definition, other than *agreeing* to the indictment's language being incorporated for that purpose.

Therefore, were Pankhurst challenging only the inclusion of the fraud language, we would, at most, review only for plain error. *E.g., United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994)(en banc). (In fact, as discussed *infra*, based on the colloquy at the charge conference, the issue presented is quite close to being invited error.)[2] However, because Pankhurst did

---

[2] As for the inclusion of the fraud language, Pankhurst claims also that it caused confusion and deprived him of a fair trial. The indictment was provided to the jury for its deliberation. As indicated in note 1, *supra*, for the "official act" description, the punctuation used in the indictment is slightly different from that used in the transcript of that portion of the jury charge when the district court, in response to Pankhurst's request for a definition of the official act, verbally incorporated part of the indictment in defining the official act. The pertinent part of the indictment reads: "with the intent to influence an official act and to influence a public official, namely Ronald Hooks, to commit and aid in committing a fraud upon the United States*, that is,* the acceptance of an offer by the

- 8 -

object generally at the charge conference to the failure of the proposed charge to describe or define the official act, we will, most *dubitante*, review, under our usual standard, the refusal to grant the requested instruction. (The detailed review that follows is also for the purpose of demonstrating further the total lack of merit in this issue.)

---

defendant to purchase a loan being sold to the public by the [RTC]." (Emphasis added.) As reflected in the portion of the charge quoted in the text, *supra*, the *transcript* of the charge, as read to the jury, uses a period, instead of a comma, between "upon the United States" and "that is" and does not have a comma after "that is". It reads in part: "with the intent to influence an official act and to influence a public official ... to commit ... a fraud upon the United States. That is the acceptance of an offer...."

Of course, the court reporter was simply transcribing the trial judge's verbal inclusion of this part of the indictment. The version seen by the jury was in the indictment. We note this punctuation difference only as a hyper-technical partial response to Pankhurst's hyper-technical, semantic contention about jury confusion.

Pankhurst urges that the phrase "that is" caused confusion because the act described after "that is" (acceptance of Pankhurst's offer for the loan) might be understood to refer to the "influence fraud" portion of the charge, as opposed to the "influence an official act" portion; and that, as a result, both the indictment and charge were "vague and ambiguous", making it doubtful that the jury returned a unanimous verdict as to what the "official act" was and, therefore, deprived him of his right to a fair trial.

We disagree. First, the pertinent portions of the indictment and the charge are neither vague nor ambiguous. It is clear that, in each, the act described after "that is" refers to the official act as well as to fraud. And, in any event, Pankhurst did not present this objection at trial; again, even if there were an error, we would review only for plain error. Once again, new (appellate) counsel is raising a point that former (trial) counsel apparently felt, correctly, was not a source of error. In sum, there was no error.

Jury charges are reviewed only for an abuse of discretion; we determine "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir.) *cert. denied*, 116 S. Ct. 261 (1995). If the trial court refuses a requested instruction, the requesting party must demonstrate that the proposal: (1) was a correct statement of the law; (2) was not substantially covered in the charge as a whole; and (3) concerned an important point in the trial such that failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense. *United States v. Smithson*, 49 F.3d 138, 142 (5th Cir. 1995) *citing, United States v. Chaney*, 964 F.2d 437, 444 (5th Cir. 1992).

Obviously, with respect to the first part of the test, Pankhurst suffers greatly from his failure to submit to the district court a specific definition of the "official act". As provided for by FED. R. CRIM. P. 30, he should have submitted a written request; he did not even verbally offer a definition. Needless to say, without a specific proposal to review, we cannot say that the definition which Pankhurst may have wanted would have been legally correct. His failure to submit a definition to the court deprives us of the very subject of the requested appellate review. Pankhurst's mere (assumed) objection to the instruction is, in short, ineffective, and, most arguably, brings our review of this issue to a close.

But, in any event, the charge, as a whole, substantially covered Pankhurst's request.  Even assuming that the incorporation of part of the indictment in the charge possibly suggested fraud to the jury as a possible intended result of the charged bribe, fraud was not a permissible basis for conviction, because the court removed the fraud portion of the indictment from the jury's consideration.  Again, the jury was charged only under subpart (A) (intent to influence official act).

As stated, in reviewing jury instructions, we look at the instructions as a whole.  **McKinney**, 53 F.3d at 676.  As given to the jury, the factual allegation underlying inducing fraud was exactly the same as that for influencing an official act: "That is the acceptance of an offer by [Pankhurst] to purchase a loan being sold to the public...."  This intent was the only one listed in the indictment and the only one argued by the Government.  In the trial court's exercise of discretion, it determined that the intent element of § 201(b)(1)(A) was satisfied, under the facts of this case, if the jury found that Pankhurst had intended, through payment of $10,000 to Hooks, to influence the RTC to accept his offer.

While the jury charge may have also erroneously included a description of this intent as § 201(b)(1)(B) "fraud", that will not defeat the fact that such intent also satisfied the "official act" prong of § 201(b)(1)(A).  *See* note 2, *supra*.  The Government still had to prove, beyond a reasonable doubt, that Pankhurst intended to influence the RTC's acceptance of his offer.  Therefore, the jury

- 11 -

charge substantially covered Pankhurst's request, as that request would not have changed the burden on the Government or the possible defenses available to Pankhurst.

As noted, Pankhurst changed counsel after trial. Concerning this requested instruction issue, it is most enlightening that, in closing argument, Pankhurst's trial counsel pushed the fraud concept vigorously:

> They charged that Joe Pankhurst with intent corruptly gave $10,000 to Ronnie Hooks with the intent to influence an official act. *And here is the official act: To commit and aid in committing a fraud upon the United States, that is the acceptance of an offer by the defendant to purchase a loan* being sold to the public by the Resolution Trust Corporation.
>
> First place, it wasn't being sold to the public, it failed right there. *But in the second place, he wasn't trying to get to perpetrate a fraud. He was trying to do a reasonable business deal...*

(Emphasis added.) In short, Pankhurst combined fraud and influencing the official act. As discussed below, this was his apparent strategy. Moreover, as noted, the defenses available to Pankhurst were exactly the same as if the court had granted his request and had therefore defined or described the official act in some other way; Pankhurst still had to counter the Government's contention that he had intended, through a payment to Hooks, to influence the RTC's acceptance of his offer.

It bears repeating that Pankhurst agreed to the indictment's being included in place of some other definition of the "official act". As referenced earlier, we will not hold that agreement to constitute invited error, because Pankhurst had, at least, earlier

requested a definition, even though the request was very general, if not vague, and even though he did not provide the desired language. But, as also reflected in this record, Pankhurst's subsequent agreement to the indictment's being used as the definition, supplemented by his comments during the charge conference, as illuminated by responding comments by the trial judge, certainly cause the claimed error to border on invited error. This is demonstrated further by the fact that Pankhurst's post-verdict motions for judgment and for new trial urge, *inter alia*, that the jury had to find *fraud*, and that the evidence was insufficient on that point. In essence, what we are being presented with on appeal, in part, is appellate counsel's quite different view of the case from that of trial counsel. It goes without saying that points raised at trial are the points that control on appeal.

In sum, pursuant to our three-part review in regard to refusal of a requested instruction, there was no reversible error. In fact, as discussed *ad nauseum*, Pankhurst's appellate counsel have tried, in large part most improperly, to present a point of error where there was none. They have, for the most part, attempted to "rewrite history". They fail. The record is clear; what took place, took place. With the instructions, to which he agreed, Pankhurst's trial counsel was given, and permitted to do, exactly what he wanted, to argue exactly what he wanted to argue.

In responding to Pankhurst's contentions about the jury charge, the Government's brief points out what is immediately

obvious from reviewing the charge conference and a few related documents.  The Government notes, *inter alia*, that Pankhurst did not submit a proposed instruction prior to the conference; that the trial court "essentially granted Pankhurst's instruction request"; that Pankhurst did not object to the included fraud language, limiting review to plain error on that point; and that, "[c]onceivably, Pankhurst 'invited' the error of which he now complains".  Despite these serious, and correct, charges by the Government, Pankhurst does not have one word in response in his "Brief For the Cross-Appellee And Reply Brief For The Appellant".  Instead, that brief deals only with the sentencing issue raised in the Government's cross-appeal.

This lack of response concerning an issue that, based on our exhaustive review, has no merit further fuels our concern about why this point was raised, and, especially, how it was presented/briefed.  Pankhurst's appellate counsel have fallen far short of making a fair, much less accurate, presentation of the charge conference and related issues.  They have presented an issue totally lacking in merit.  Counsel are warned that such conduct in the future may result in sanctions being imposed against them.

B.

In district court, Pankhurst preserved our usual standard of review for his sufficiency issue by moving, at the close of the Government's case and at the close of the evidence, under FED. R. CRIM. P. 29(a), for a judgment of acquittal, contending, *inter alia*, that the evidence was insufficient to prove criminal intent beyond

a reasonable doubt. *See* **United States v. Castaneda-Cantu**, 20 F.3d 1325, 1329-30 (5th Cir. 1994); **United States v. Knezek**, 964 F.2d 394, 399-400 & n.14 (5th Cir. 1992). (After the verdict, Pankhurst unsuccessfully moved for such judgment or for new trial and, later, for reconsideration of the denial of that motion.) Therefore, the standard of review is whether the evidence, as viewed in the light most favorable to the verdict, would permit a rational trier of fact to find Pankhurst guilty beyond a reasonable doubt. **United States v. Jaramillo**, 42 F.3d 920, 922-23 (5th Cir.), *cert. denied*, __ U.S. __, 115 S. Ct. 2014 (1995); **Castaneda-Cantu**, 20 F.3d at 1330.

A conviction under 18 U.S.C. § 201(b)(1)(A) requires: (1) that Pankhurst directly, or indirectly, corruptly gave, offered or promised anything of value; (2) to any public official; (3) with intent to influence any official act. **United States v. Tomblin**, 46 F.3d 1369, 1376 (5th Cir. 1995). The evidence showed that Pankhurst negotiated with the RTC to purchase the Jetera loans; that, during these negotiations, he showed Hooks a stack of cash and said an acceptance of his offer would be worth ten of them; that, in surreptitious, but recorded, meetings, Pankhurst handed Hooks a "corporate records" binder which instead contained $5000 in cash, and then offered, and later delivered, the other half of the $10,000 when he received acceptance of his offer to the RTC; and that Pankhurst attempted to close his "deal" with the RTC.

In short, there was sufficient evidence that money was offered to Hooks, a public official, and that the goal was to influence the

RTC's acceptance of Pankhurst's loan purchase offer, an official act. In addition, as both shown above and discussed further below, the evidence was more than sufficient regarding the requisite "corrupt" intent in offering the $10,000 to Hooks.

There was evidence that, without corrupt intent, Pankhurst was offering the $10,000 to Hooks as some type of "consulting fee" (as if that could be without such intent), and this view is supported by the fact that the loan-purchase offer Pankhurst made to the RTC could have been accepted by the RTC regardless of any influence on the part of Hooks. This is further corroborated by the fact that, at the sham closing, Pankhurst was careful that none of the documents contained any misstatements to the RTC. (Although this meeting was videotaped, Pankhurst's trial counsel failed, through claimed oversight, to offer the tape in evidence. Post-trial, it was submitted to the court by Pankhurst's trial counsel for consideration on sentencing.) Regardless of these facts, Pankhurst's claim fails for a number of reasons.

First, despite complaining of an apparent lack of integrity among the jury, Pankhurst does not contend there was juror misconduct or any external pressure on the jury to convict. He points to a pre-sentencing letter to the trial judge from the jury foreperson, which stated that "... we ha[d] no proof that Mr. Pankhurst intentional[ly] walked into the Resolution Trust Corporation's office on the day in question and offered to bribe Mr. Hooks"; that the reason the jury decided to convict was because on Friday, when they were deadlocked at 9-3 to convict, they were

told that, if they did not then reach a verdict, they would return on Monday, and, as a result, the three holdouts quickly changed their minds; and that, despite the professed lack of proof of intent, the jury voted to convict because Pankhurst was wealthy and had retained an expensive lawyer.

This does not rise to the level of noticeable juror misconduct. (At sentencing, the court advised counsel that the letter had been submitted; Pankhurst's lawyer had known of its probable submission and his inquiry about the letter prompted the court's reference to it. Despite suggesting that he might do so, Pankhurst did not seek to move for a new trial based on it. Reference to the letter, and the court's deferring action on it "until the matter arises", are included in the court's sentencing-ruling, quoted *infra*.) In any event, Pankhurst raises only sufficiency, not juror misconduct; the points made about the jury do not affect our sufficiency analysis. Restated, the objective sufficiency standard obviously does not include examination of jury deliberations or the jurors' true feelings; instead, we examine the evidence to determine whether it was sufficient for a rational jury to convict. *Jaramillo*, 42 F.3d at 922-23.

As discussed, the evidence was more than sufficient. For example, it included recordings of the two meetings in which Pankhurst gave the $10,000 -- in $5,000 increments -- to Hooks. These recordings include discussion about their first meeting, at the RTC office, during which Pankhurst placed the money on the table. As reflected by the recording of the second

- 17 -

hotel/automobile meeting, Hooks stated: "But it scared me when you walked into the office and ... laid that fee on the table and said, 'hey, ... I need a consultant' or something.  It scared me ... and I had to give it some thought."  Pankhurst replied: "Of course, ... but who's got time to do the romance deal and the little tap dance; ... here it is; and ... that's the way I saw it."

Hooks testified that Pankhurst offered him $10,000 to act as "consultant" throughout the negotiation process.  The manner of the transfer of the cash, at surreptitious meetings and hidden in a "corporate records" binder and in a plain brown manila envelope, point to Pankhurst's corrupt intent.  Moreover, the fact that the second half of the payment to Hooks was not to be made until after Pankhurst received acceptance of his offer to the RTC points to the fact that this was not a consultant fee, but a *quid pro quo* for the RTC's acceptance of Pankhurst's offer.

This was a classic case for a jury.  The competing evidence may seem convincing to some, but it presents merely an alternative to the decision a rational jury could reach.  The contention that Pankhurst did not want to mislead the RTC in any of the closing documents, Pankhurst's testimony that he was attempting to hire Hooks as a "consultant" and that he thought this sort of transaction was legal and common, and the testimony about his good character, do not render the other evidence insufficient as a basis for conviction by a rational jury.  Under these circumstances we cannot upset the verdict.  *E.g., United States v. Pettigrew*, 77 F.3d 1500, 1518 (5th Cir. 1996)("The evidence need not exclude

every reasonable hypothesis of innocence ... and the jury is free to choose among reasonable constructions of the evidence.").

Finally, Pankhurst contends that the evidence was insufficient to prove that the loan he was attempting to purchase was in fact being sold to the public. The issue is meritless. The indictment charged that the official act which Pankhurst attempted to corruptly influence was the acceptance of his offer to purchase the loan. The indictment states further, unnecessarily for purposes of § 201(b)(1)(A), that the loan had been offered for sale to the public. This description of the loan Pankhurst was trying to purchase was surplusage; even if the evidence did not support a finding that the loan was offered to the public, the statute was satisfied and the conviction must stand.

In the alternative, Pankhurst seeks a new trial. We review denials of such motions for abuse of discretion. *E.g.,* **United States v. Giraldi**, 86 F.3d 1368, 1374 (5th Cir. 1996). For the reasons given above, the district court did not abuse its discretion.

## C.

The challenge to the district court's *sua sponte* downward departure is premised on both a lack of notice and the basis for the departure. In urging that the departure should be affirmed, Pankhurst counters, *inter alia*, that the Government failed to object to the departure -- both to lack of notice and on the merits.

As hereinafter discussed, we conclude, based on our review of the record, that the Government's lack-of-notice objection was sufficient, even though it could - and should - have been far more specific. And, we conclude that, because the requisite Rule 32 notice of a possible downward departure was not given, we must remand for resentencing; therefore, we do not reach whether the departure would be upheld. For our analysis, a most detailed review of Pankhurst's sentencing process is required. Moreover, this detailed presentation highlights the extremely careful attention and painstaking analysis given the merits of the sentencing issue/departure question by the district court.

The Presentence Report (PSR) recommended that Pankhurst's required base offense of 10 under U.S.S.G. § 2C1.1(a), for bribery of a public official, be increased, as required by § 2C1.1(b)(2) ("Specific Offense Characteristics"); a 14-level increase was recommended, on the basis that the requisite "benefit" to be received in return for the $10,000 payment was $5,053,000. (Pursuant to § 2C1.1(b)(2), because the "benefit" exceeded $2,000, reference was made to the table in § 2F1. ("Fraud or Deceit"); the offense level is to be increased by 14 if the loss exceeds $5 million.)

Because Pankhurst (a first offender) had a criminal history category of I, the guidelines sentencing range was 51-63 months. Pursuant to Rule 32(b)(4)(B), the PSR commented on possible sentencing adjustments; it recommended, *inter alia*, against a reduction for acceptance of responsibility, and, critical to the

issue at hand, stated that the probation officer did not have any information concerning either the offense or Pankhurst which would justify a departure from the guidelines' sentencing range.

In his pre-sentencing filing in response to the PSR, Pankhurst stated that, in addition to prosecuting Pankhurst, the Government had

> sought to ruin him financially in the business world. That ruination has been extremely effective. This is a factor that has not been taken into consideration adequately by the Sentencing Commission and entitles [Pankhurst] to a downward departure.

The Government's pre-sentencing response objected to Pankhurst's downward departure demand, stating with regard to the claimed attempt to "ruin" Pankhurst that, as with all convictions, there had been a press release.

At sentencing, in support of the PSR's recommendation that the benefit was in excess of $5 million, the Government urged that the loss was greater than that: simply put, Pankhurst had offered $560,000 for the loans to Jetera, for which slightly more than $5.6 million was owed, and which were secured by the Jetera property; deducting that $560,000 from the approximate $5.6 million owed left a benefit in excess of $5 million.

As he had in his objections to the PSR, Pankhurst countered at sentencing that there was no "benefit" (thus leaving the offense level at 10), asserting that, even without the $10,000 payment to Hooks, Pankhurst would have still acquired the loans/property for the $560,000 offered. Along that line, Pankhurst pointed out that,

in fact, the RTC later accepted only $419,000 for the property, far less than the $560,000 Pankhurst had offered.

In the alternative, Pankhurst urged that, at most, the gain, not benefit, would have been what Atlas Oil (the actual offeror -- owned by Pankhurst) might have realized later if it had both acquired the property and sold it; using the offer of $560,000 and the then-appraised value of $800,000, this sale would have resulted in a gain of $240,000. But, Pankhurst argued that, because neither event occurred, there was no "benefit" for guidelines purposes, again leaving the offense level at 10.

Having an offense level no greater than 10 was critical for Pankhurst. As noted *supra*, for a "first offender" such as Pankhurst, and with that offense level, the sentencing court "may substitute probation for a prison term". U.S.S.G. Ch. 1 Pt. A 4(d) (1995).

After hearing extensive and detailed argument concerning the parties' vastly different positions as to the § 2C1.1(b)(2) "benefit", the court stated: "When I hear two intelligent lawyers as thoroughly familiar with the facts as you two, in this much disagreement, *I just wonder if there is not a problem in the guidelines*." (Emphasis added.) (The sentencing judge's comments were consistent with his views expressed three weeks earlier, at the originally-scheduled sentencing hearing; that hearing was continued because of Pankhurst's late receipt of the Government's response to his objections to the PSR. Prior to continuing that earlier hearing, the court heard similar argument by Pankhurst on

- 22 -

why there was no "benefit"; the court indicated then that it was open on the issue.)

After further detailed argument, the court stated:

> We can stop right now on one point.  I do not believe there was any actual gain.  There was a possible remote potential gain, at least one level removed, that [Pankhurst] might have wound up with a corporation [Atlas Oil] with a piece of property that might be worth $800,000, that [Pankhurst] got for $560,000.

Following further argument over "benefit", *vel non*, the court stated:

> You both are absolutely right up to a certain point.  I think this is a unique fact situation.  I think what Mr. Pankhurst did was offer a bribe to do something that he could have done without a bribe.  It was a, excuse the technical term, a dumb thing to do.  And it constituted a violation of the law.
>
> *What we are talking about now is what the appropriate punishment would be and whether the sentencing guidelines covers it.  And I am slowly becoming convinced that because of the facts in this case, it is not something that I can find in the guidelines.  I am having a real struggle with it.*

(Emphasis added.)

Following yet further argument as to "benefit", and apparently taking hope in the court's twice-expressed concerns that the incident under consideration was not covered by the guidelines, Pankhurst urged, *for the first time*, a downward departure on that basis, claiming that the situation had "not [been] taken into consideration adequately" by the Guidelines.  But, as the Government immediately pointed out, this departure-basis was totally different from the basis urged in Pankhurst's pre-hearing

submission, discussed *supra*. As noted, and as the Government pointed out to the district court, Pankhurst had then claimed entitlement to a departure, but only on the basis that the Government had ruined his ability to do business. As the Government had discussed in its filed response to the earlier filed departure demand, the Government pointed out to the sentencing judge that Pankhurst based this entitlement claim on harm supposedly resulting from a press release about his conviction.

Following even more argument, the court ruled:

> All right. I have given this matter a great deal of thought. I have considered, with the probation officers, their various addenda and supplements.
>
> And I believe that the probation officers are correct, and I adopt their report, that the base offense level is ten; that the potential benefit to Mr. Pankhurst through his ownership of the [Atlas Oil] stock was most likely the difference between $560,000 and $800,000.
>
> I believe that $800,000 was the appraised value of the property at the time [Pankhurst] made the $560,000 offer, and therefore I believe that is the benefit [Pankhurst] intended to receive.
>
> With his criminal history category of one, his guideline imprisonment range at that point would be 27 to 33 months.
>
> His argument that he is entitled to a two level decrease for acceptance of responsibility is a close one. But I have never heard him admit that he offered the money to Mr. Hooks for the purpose of influencing Mr. Hooks to do something. Certainly he would not admit that he offered it as a bribe. Therefore I cannot give him acceptance of responsibility.

> I am not impressed with the letter from the foreperson of the jury [discussed *supra*]. We will take that up if the matter arises.
>
> But I do want to point out [that] page 7 of the latest version [1995] of the guidelines manual has this sentence in it[:] ["]The commission of course has not dealt with the single acts of aberrant behavior that still may justify probation at higher levels through departures.["]
>
> And what they are referring to is [U.S.S.G. §] 5K2.0 and 18 [U.S.C. §] 3553. And pursuant to those provisions, I find that there exists mitigating circumstances of a kind and a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, and therefore the sentence should be different from that provided in the guidelines. Specifically, the difference, the increase over the ten level.
>
> I think the facts in this case are so peculiar and in such a strange state that the guidelines do not apply adequately in that increase. Therefore I am going to sentence him at level 10.

Pursuant to the resulting option given the court because of that low offense level to place Pankhurst on probation, rather than in prison, Pankhurst was given probation for one year, with a condition of home confinement. He was also fined $50,000. Later, the court remarked: "Mr. Pankhurst, because of the very peculiar facts of this case, I am giving you a break which the Government is going to be very upset about. I may have sentenced you both to [an appeal to the Fifth Circuit in] New Orleans."

The court had not put the parties on notice of this possible -- and now just announced -- basis for departure. But, unlike its objection earlier in the hearing, when Pankhurst seized on this basis for the first time, the Government did not object, after the

sentencing-ruling, on the ground that the court was departing downward without giving Rule 32 pre-sentencing notice. Instead, at this point (post-ruling), the Government objected only to the basis for the departure, and objected later to the court's not imposing sentence within the range recommended by the PSR.

The judgment, entered six days after the sentencing hearing, provided that the PSR was adopted, except that the court found a lower "benefit" ($240,000 instead of $5 million), resulting in an 8, instead of a 14, level increase. This resulted in a total offense level of 18, with a sentencing range of 27 to 33 months, as had been stated in the court's verbal sentencing-ruling. The following reason was then given for the downward departure, consistent with that given at sentencing and pursuant to 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0: "The Court finds that the nature of the offense, representing a single, criminal act, is a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission, pursuant to U.S.S.G. 5K2.0."

Before we can reach the merits of the basis for the departure, we must consider the Government's contention that it was denied the requisite Rule 32 notice of the court's intent to depart downward. It is undisputed that the court did not give such notice to the parties. And, prior to sentencing, the only departure-basis urged by Pankhurst was the claim that he was "entitled" to a downward departure because the Government had "ruin[ed] him financially". But, as noted, after the court alluded twice at sentencing to a

possible basis for a § 5K2.0 departure, Pankhurst's counsel seized upon it:

> I think that this is a proper case for a departure because the guidelines has not taken into consideration adequately the circumstances of this case, and under the catchall provision of the guidelines and the Code, and I have cited that to Your Honor in the memorandum.

As also noted, the Government objected immediately:

> Judge, the government would object to a downward departure. [Pankhurst's counsel] specifically said that the basis for his downward departure was because the Government had basically ruined his client's ability to do business by sending an alleged press release to Dunn & Bradstreet.

In short, the Government objected promptly to the fact that the departure, alluded to by the court, was being requested by Pankhurst on a new ground for which the Government had not received pre-hearing notice. Restated, at that point in the hearing, the objection alerted the court, as well as Pankhurst, that the Government had not received notice of this new departure-basis, later used by the court. Such lack-of-notice, the Government contends, violates the rule enunciated in ***United States v. Burns***, 501 U.S. 129 (1991).

1.

Prior to reaching this contention, we must decide whether the Government's objection, including combined with those post-ruling, is sufficient; that is, whether it presented/described adequately a lack-of-notice ground. Pankhurst urges that it did not; and that

we should, therefore, review only for plain error. *See* ***United States v. Hawkins***, 87 F.3d 722, 730 (5th Cir. 1992).

The objection to the basis seized by Pankhurst and ultimately used by the court certainly alerted the court that the sentencing hearing had moved to new territory for which the Government had not been given notice. As the court moved to this new territory off and on during the hearing, both before and after the Government objected to the new departure-basis when Pankhurst seized upon it, the Government should have better articulated its lack-of-notice objection, on the assumption that the sentencing court seemed inclined increasingly to use that basis.

But, surely, the court was aware when it ruled that it was utilizing a departure-basis *sua sponte*, without having given notice; and that, because of a lack of notice from both the court and Pankhurst, the Government had not had an opportunity to comment consistent with Rule 32. Part of the court's awareness had to come from the Government's earlier objection when Pankhurst urged this same -- new -- basis. On this record, the lack-of-notice objection was sufficient. *See* ***United States v. Knight***, 76 F.3d 86, 87 (5th Cir. 1996). Accordingly, we turn to whether notice was required.

2.

Under ***Burns***, Rule 32 requires that, before a district court may depart upward, the defendant must have notice, either in the PSR (*see* Rule 32(b)(4)(B)), or in a pre-hearing submission by the Government, or from the court. Our court so held prior to **Burns.** *See* ***United States v. Otero***, 868 F.2d 1412, 1415 (5th Cir. 1989).

- 28 -

However, our court has never expanded the holdings in **Otero** and **Burns** to the situation at hand -- the *Government's* not receiving notice of a possible *downward* departure.

Nevertheless, at least four other circuits have held that the rule applies to downward departures. *See* **United States v. Alba**, 933 F.2d 1117 (2d Cir. 1991); **United States v. Maddox**, 48 F.3d 791 (4th Cir. 1995); **United States v. Andruska**, 964 F.2d 640 (7th Cir. 1992); **United States v. Green**, 105 F.3d 1321 (9th Cir. 1997). Apparently, no circuit has held to the contrary. We join those circuits and hold that notice must be given to the Government before a district court may depart downward. This result is mandated by Rule 32, **Burns**, and **Otero**.

Rule 32 states that "the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence...." FED. R. CRIM P. 32(c)(1). In other words, the Rule provides that the Government is due the same notice as is the defendant.

For this very reason, **Burns** noted that, for the issue in that case (pre-upward departure notice to a defendant), it would be

> equally appropriate to frame the issue as whether the *parties* are entitled to notice before the district court *departs upward or downward* from the Guidelines range. Under Rule 32, it is clear that the defendant and Government enjoy equal procedural entitlements.

- 29 -

*Burns*, 501 U.S. at 135 n.4 (emphasis added).  Along these lines, *Burns* otherwise supports the application of its holding to the Government, as well as the defendant, for a downward departure.

*Burns* reasoned (as did *Otero*, 868 F.2d at 1415) that Rule 32 is intended to achieve focused adversarial development of the issues pertinent to a particular sentence.  501 U.S. at 135. Furthermore, the Rule explicitly gives the defendant the right to comment on a particular departure before it is imposed; *Burns* reasoned that, for this right to be meaningful, it must carry with it the right to notice of a possible departure.  *Id.* at 136.  As noted, the Government has the same comment-right; concomitantly, it must have the same notice-right.

The sentencing hearing for this case offers an excellent example of why such notice is required, as well as the benefit that will flow to the sentencing court as a result.  The district court was troubled greatly by the facts at hand and extensively and most insightfully developed the question.  Had the Government, and Pankhurst, been on notice of the new, possible departure-basis, they could have been of great assistance to the court through the resulting/subsequent legal research, briefing, and argument.

For example, as stated in the judgment, the court felt that "the nature of the offense, representing a single, criminal act, is a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission, pursuant to U.S.S.G. 5K2.0."  Had the parties been on notice, they could have better assisted the court in determining, as a further example,

whether "the nature of the offense, representing a single criminal act" had been considered by the Sentencing Commission in imposing the § 2C1.1(a) base offense level of 10; the Government urges here that this base offense level does reflect such consideration.

As another possible aid to the court, the parties could have explored, or developed further, the introductory commentary to U.S.S.G. § 2C ("Offenses Involving Public Officials"):

> The Commission believes that pre-guidelines sentencing practice did not adequately reflect the seriousness of public corruption offenses. Therefore, these guidelines provide for sentences that are considerably higher than average pre-guidelines practice.

U.S.S.G. § 2 Pt. C Introductory Commentary.

As yet another example, the extensive commentary to § 2C1.1 might have provided further ground that could have been developed to assist the court. And, finally, counsel would have been far more able during the hearing to present and argue the other relevant portions of the guidelines and the case law.

Accordingly, due to the lack of notice, we must remand the case to the district court for resentencing, including giving the Government and Pankhurst notice and an opportunity to respond to, and otherwise comment on, the noticed possible ground(s) for departure.

### III.

For the foregoing reasons, the conviction is **AFFIRMED**; the sentence is **VACATED**; and this case is **REMANDED** to the district court for resentencing, consistent with this opinion.

*AFFIRMED in PART; VACATED and REMANDED in PART*

BENAVIDES, Circuit Judge, specially concurring.

I concur in the judgment of the majority affirming appellant's conviction and remanding for resentencing.

Appellant contends that the district court abused its discretion by incorporating in its jury charge the original indictment. He argues that the indictment should have been redacted to omit any reference to the government's theory that he sought to influence a public official to commit a fraud upon the United States. As the majority correctly observes, the proof at trial focused on the government's other theory, *i.e,* that appellant sought to influence an official act. *Compare* 18 U.S.C. § 201(b)(1)(A) *with id.* § 201(b)(1)(B).

Because trial counsel did not object to use of the unredacted indictment, review is for plain error. FED. R. CRIM. P. 52(b). Even assuming that it was error to submit the original indictment to the jury, and that the error was "plain" in the sense of being "clear" or "obvious," appellant has demonstrated no effect on his substantial rights. *Cf. United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994). Accordingly, this first claim fails.

Appellant also argues that the district court erred in its jury charge by failing to define the "official act" which he allegedly attempted to influence. The court refused defense counsel's request to define the official act for the jury, instead referring the jury to the unredacted indictment. Appellant contends that this was confusing in that the jury may have concluded that the "official act" was the unspecified and unproven "fraud" mentioned in the indictment.

Any confusion on this score was invited, if not manufactured, by defense counsel in his closing argument to the jury. Appellant complains that the jury charge regarding the "official act" was "ambiguous and confusing . . . in light of counsel's arguments;" yet it was defense counsel who described the "official act" as the "fraud" alleged in the indictment.[3] This circuit will not reverse on the basis of invited error, absent manifest injustice. *United States v. Sanchez*, 988 F.2d 1384, 1392 (5th Cir. 1993). There was no such injustice in this case. It is clear from the record evidence and the comments of the district court that the official

---

[3]Defense counsel argued to the jury:

They charged that Joe Pankhurst with intent corruptly gave $10,000 to Ronnie Hooks with the intent to influence an official act. And here is the official act: To commit and aid in committing a fraud upon the United States, that is the acceptance of an offer by the defendant to purchase a loan being sold to the public by the Resolution Trust Corporation. . . . [H]e wasn't trying to get to perpetuate a fraud. He was trying to do a reasonable business deal.

act which appellant allegedly sought to influence was the RTC's sale of the note.[4]

Appellant's sufficiency claims are meritless.  Accordingly, I would affirm appellant's conviction.  However, I would vacate and remand his sentence for the reasons expressed by the majority.  I therefore concur in the judgment.

---

[4]As the district court explained to the jury at the beginning of the trial:

> Mr. Pankhurst is charged with giving a $10,000 payment to Mr. Hooks to influence Mr. Hooks to sell him the note. That's what the case, basically, is about.

- 34 -