**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 27, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CHRYSANTH G. GRUENANGERL,
a/k/a Chris McCleod,

    Defendant-Appellant.

No. 07-1321

(D.C. No. 1:06-CR-00002-WDM)
(D. Colorado)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY,** Chief Judge, **BALDOCK,** and **BRISCOE**, Circuit Judges.

---

Defendant Crysanth Gruenangerl (Defendant) appeals his conviction on one count of bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(A), arguing that the evidence was insufficient to prove his guilt beyond a reasonable doubt. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

The evidence presented at trial established the following. The Ski Apache ski area is located in the Lincoln National Forest near Ruidoso, New Mexico. In 2004, at the time of all relevant events, the area was owned and operated by the Mescalero Apache Tribe of native Americans. The Lincoln National Forest was managed by the Smokey Bear Ranger District of the National Forest Service, a division of the United States Department of Agriculture. Among other things, the Forest Service issued special use permits that allowed private parties such as the Mescalero Apache Tribe to conduct commercial enterprises, including the operation of ski areas, within national forests.

The base facilities at Ski Apache and the ski lifts and mountain trails of the area were operated pursuant to special use permits from the Forest Service. One of the conditions to the special use permits issued for Ski Apache was an annual safety inspection of the lifts at the ski area. Special safety inspections were also conducted if specific safety concerns were raised about any of the equipment. If a safety inspection found the lift equipment to be unsafe, the lifts would be shut down until necessary repairs or improvements were completed.

While hiking in the Ski Apache area in 2004, Defendant noticed that the concrete support pads for the Ski Apache gondola, which was forty-one years old at the time, appeared to be unsafe. He took pictures of several support pads documenting this problem. Shortly thereafter, Defendant approached Randy

Woolwine, the Vice President in charge of sales for Doppelmayr CTEC in Golden, Colorado. Doppelmayr is an American subsidiary of an Austrian company that builds aerial tramways, gondolas, and other ski lifts. Defendant told Woolwine that, based on his personal observations and the photographs of the gondola support pads, he believed that the gondola was unsafe and needed to be replaced. Defendant asked Woolwine to inspect the gondola and tell the owners that the gondola was unsafe. Woolwine advised Defendant that the Forest Service, not Doppelmayr, was responsible for safety inspections and suggested that Defendant contact Michael Lane, a regional tramway engineer employed by the Forest Service, about conducting such an inspection.

Defendant asked Woolwine about the possibility of earning a commission or finder's fee if he was able to convince Ski Apache to purchase a new Doppelmayr gondola to replace the old gondola. Woolwine told Defendant that if Defendant was instrumental in the sale of a Doppelmayr gondola, Doppelmayr would pay him a finder's fee of one to two percent of the purchase price. When asked at trial about this offer, Woolwine admitted that he personally believed the chances were slim that Defendant would be successful in selling Ski Apache a new lift, but also stated that he considered this to be a firm offer that Doppelmayr would honor in the event that Defendant actually was successful. Before parting ways with Defendant, Woolwine provided him with Doppelmayr promotional materials describing ski lift products costing as much as $20 million.

3

After his conversation with Woolwine, Defendant contacted the Smokey Bear District Ranger Office, told them of his concerns that the Ski Apache gondola was unsafe, and showed them his photographs. Based on Defendant's report, a meeting was held at the Forest Service office in Ruidoso in early November of 2004. In attendance were Richard Carlson and Michael Lane of the Forest Service, Ski Apache Manager Dan Conners, and Joe Gmuender, an independent engineer hired by the ski area. Defendant's ex-wife Esther McLeod also attended the meeting on his behalf. After discussing Defendant's photographs and assertions about the gondola's safety, Lane and Gmuender conducted an inspection of the gondola and concluded that it was safe. Lane then wrote a field report detailing the inspection and its findings. A copy of the report was provided to Defendant as an interested party.

Late in the day on November 23, 2004, Lane received a call on his cellular phone from Defendant. Defendant was "irate, irritated, [and] very excited" and questioned how the inspectors could have found the gondola to be safe. Vol. VII at 183:24. Lane became suspicious that he was somehow being "set up" after Defendant told him that he had taped a conversation with Conners. Explaining to Defendant that he was driving his truck at the time, Lane asked Defendant to call him back at his home.

A short time later, Defendant called Lane at Lane's home and again questioned how the old gondola could have been found safe. According to Lane,

4

Defendant advised him that he wanted to sell the ski area a new Doppelmayr gondola and insisted that Lane was the person responsible for making that kind of decision. Defendant purportedly told Lane that he would split with him a finder's fee of two percent of the purchase price of a new Doppelmayr gondola if Lane would tell the owners of Ski Apache that the existing gondola was unsafe. Lane indicated that he could not do as Defendant wished and asked if he could contact Defendant the next day to address Defendant's safety concerns.

The next day, November 24, 2004, Lane informed his supervisors at the Forest Service of Defendant's telephone calls. They put him in touch with Mark Hopko, a special agent with the Office of the Inspector General of the Department of Agriculture. Hopko arranged to record further telephone conversations that day between Lane and Defendant. During the recorded conversations on November 24, 2004, Defendant again expressed his dissatisfaction with Lane's conclusion that the Ski Apache gondola was safe. When asked by Lane what Defendant wanted him to do, Defendant repeated his offer to split a two percent commission from Doppelmayr with Lane if Lane would say that the existing gondola was unsafe and tell the Mescalero Apache Tribe and Richard Carlson of the Forest Service that the old gondola would have to be replaced with a new one.

On January 9, 2006, a federal grand jury indicted Defendant on two counts

of offering a bribe to a public official, in violation of 18 U.S.C. § 201(b)(1)(A).[1]

Count One charged an act of bribery of a public official occurring on November 23, 2004 (the date of the first conversations with Lane), while Count Two charged an act of bribery of a public official occurring on November 24, 2004 (the date of the later conversations with Lane). Each count charged that Defendant offered to bribe Lane if Lane "would tell the Ski Apache ski area that it needed to replace the gondola that was the subject of [his] field report." Vol. I, doc. 1.

The case was tried before a jury. Following the close of the government's case in chief, Defendant moved for a judgment of acquittal on both counts, arguing that the evidence was insufficient to prove he intended to influence any official act. The district court declined to rule on the motion, reserving the right to do so until the trial was concluded. Following the close of Defendant's case, the court informed him that the motion remained pending, but that the case would be submitted to the jury.

On September 5, 2006, the jury acquitted Defendant on Count One of the indictment, but convicted him on Count Two. The district court, implicitly

_____

[1] 18 U.S.C. § 201(b)(1)(A) provides in pertinent part that:
Whoever . . . directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official . . . with intent . . . to influence any official act . . . shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

6

denying Defendant's motion for judgment of acquittal, sentenced him to thirty-six months' imprisonment. Defendant now appeals, renewing his argument that the evidence was insufficient to convict him.[2]

## II.

We review the district court's denial of a motion for judgment of acquittal due to insufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the government." United States v. Bailey, 327 F.3d 1131, 1140 (10th Cir. 2003) (quoting United States v. Austin, 231 F.3d 1278, 1283 (10th Cir. 2000)).

> We must determine whether there is evidence from which a jury could find the defendant guilty beyond a reasonable doubt. In reviewing the evidence, however, we do not weigh the evidence or consider the credibility of the witnesses in making our determination. We may reverse the jury's verdict only if no rational trier of fact could have found the essential elements of the crime beyond a

---

[2] Defendant also argued in his briefs to this court that the district court erred by failing to dismiss Count Two because the counts in the indictment were multiplicitous. (We note that at trial, Defendant was less specific in that he moved to dismiss either one of the two counts at the close of the government's case.) At oral argument, however, counsel for Defendant abandoned this asserted error. Were we to nonetheless consider the issue, we would conclude that any error was harmless. Defendant was convicted and sentenced on only one of the two allegedly multiplicitous counts, thus eliminating the principal harm posed by multiplicitous counts. See United States v. Barrett, 496 F.3d 1079, 1095 (10th Cir. 2007); United States v. Webber, 255 F.3d 523, 527 (8th Cir. 2001). Any additional harm to Defendant such as possible prejudice in the eyes of the jury was the result of Defendant's failure to object to the indictment prior to trial and cannot serve as grounds for reversal. See United States v. Morehead, 959 F.2d 1489, 1506 n.11 (10th Cir. 1992). Further, even if one of the two counts were dismissed, the testimony concerning the dismissed count would still have been relevant and admissible at trial on the remaining count.

reasonable doubt.

Id. (quotation marks and citation omitted). Applying this standard, the evidence was sufficient for a reasonable jury to conclude that the government had proved each of the elements of the crime beyond a reasonable doubt.

"A conviction under 18 U.S.C. § 201(b)(1)(A) requires: (1) that [the defendant] directly, or indirectly, corruptly gave, offered or promised anything of value; (2) to any public official; (3) with intent to influence any official act." United States v. Pankhurst, 118 F.3d 345, 352 (5th Cir. 1997) (citation omitted). Defendant does not dispute that Lane is a public official. He argues, however, that his statements during the November 24th conversations are too vague to be construed as an offer or promise of anything of value to Lane. He also argues that the government had to prove that the "official act" in question was the revision of Lane's field report, and that the government's evidence did not show that Defendant intended that Lane change the field report. Neither argument is persuasive.

Defendant's argument that the November 24th conversations are too vague to be construed as a bribe is belied by the transcript of those conversations.[3] While the conversations were at times odd and Defendant's half of the discussion

---

[3] Though both the recording of the November 24th conversations and the transcript were presented to the jury at trial, neither was included in the record. Both Defendant and the government have appended identical copies of the transcript to their briefs, which we assume accurately relate the content of those conversations.

8

is susceptible to multiple interpretations, Defendant made several statements during the conversations that a reasonable jury could construe as offers to pay Lane in exchange for rendering an official opinion that the Ski Apache gondola was unsafe:

> [Lane:] So what do you want me to do?  How can I help you?
>
> [Defendant:] Mike, tell them they have to replace the old gondola for a new one, period.  I split with you. . . . I split with you two percent. And I put it into writing.  You get two percent.  I get two percent from a twenty million dollar contract.  You get your money.

Aplt. Br., App'x 3, at 5.

> [Defendant:] I would like to have a gondola, a new gondola up here . . . You and me, we do that.  We get two percent from Doppelmayr. You and me.  Twenty million (unintelligible) two hundred thousand (unintelligible).  I do not believe when you say, Hey, this is all great, that they can ride the gondola for another 20, 21 years.  I do not believe so.

Id. at 9-10.

> [Defendant:] . . . [W]e have to sell them a gondola.  I split with you two percent that Doppelmayr promising me.  I don't know what to do.  You just tell me.  Forty-one years old doesn't work for (unintelligible) period.  I don't know what you tell Mr. Carlson. . . .

Id. at 10-11.

> [Defendant:] . . . The Indians when they want to spend five hundred million dollars, that they do (unintelligible) they can spend twenty million dollars on a new gondola, period.  You help me and you get all the money you need.  OK?  Period.  Between you and me.

Id. at 11-12.

> [Defendant:] OK, and I tell you one thing, OK?  When you, when

9

you need something, we've got this million dollar house up here. I got everything in my life. I got the Hummer. I got the new Cadillac. I got, I got the ex Eddie (unintelligible). I have everything in my life. When you need something, contact me and you be up here right away. I give you a safe life.

[Lane:] I appreciate that, sir.

[Defendant:] Mike, you need something just call me. OK?

[Lane:] All right. It makes me nervous.

[Defendant:] Money-wise, we are millionaires. We just, we just want to have peace with the gondola up here, and you can help me with that by saying this is not right. Forty-one-year-old car doesn't drive like a 2005.

Id. at 14.

Defendant cannot seriously contend that his statements during these conversations were too vague to be construed as bribes. The jury knew that at the time of the conversations, Defendant had already learned from Randall Woolwine at Doppelmayr that Lane was employed by the Forest Service and was responsible for conducting safety inspections of gondolas and other ski lifts. It knew that Defendant had received a copy of Lane's report finding that the gondola was safe to operate. The jury knew that if the gondola was found to be unsafe, Defendant could have earned a finder's fee of one to two percent of the sale price of a new gondola. With this background, Defendant's end of the discussion is far from vague: if you "help me . . . by saying this is not right," id. at 14, that is, by "tell[ing] them they have to replace the old gondola for a new one," id. at 5, "I

10

split with you two percent that Doppelmayr promising me . . . and you get all the money you need," id. at 10-11.  While this speaks for itself, the jury also heard testimony from Agent Mark Hopko of the United States Department of Agriculture that during an October 2005 interview, Defendant admitted to telling Lane that he wanted him to say that the gondola was unsafe and that he offered Lane a share of his commission if Lane would do so.  Vol. VII at 94:1-6; see also id. at 123:13-17, 128:1-7.  This testimony was corroborated by Esther McLeod, Defendant's ex-wife, who was present at the interview.  Vol. VIII at 84:12-15.

Defendant's argument that the government was required to prove that the official act he sought to influence was Lane changing his field report, rather than saying that the gondola was unsafe, has no merit.  "[T]he term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).  As charged by the indictment, Defendant sought to have Lane "tell the Ski Apache ski area that it needed to replace the gondola that was the subject of the field report."  Vol. I, Doc. 1.  The government presented evidence that among Lane's official duties was conducting inspections of ski lifts and lift equipment and rendering professional opinions regarding their safety.  Vol. V at 139:2-9; Vol. VII at 155:6-7; id. at 159:23-160:5.  The government also presented evidence that in his official capacity, Lane

11

was called in to participate in a safety inspection of the Ski Apache Gondola. <u>Id.</u> at 161:22-162:10. Based on this evidence, the jury could conclude that "tell[ing] the Ski Apache ski area that it needed to replace the gondola" was an official act within the meaning of 18 U.S.C. § 201(a)(3).[4]

III.

The district court's denial of Defendant's motion for judgment of acquittal is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[4] Even assuming that the government could somehow bind itself to prove the theory set forth in its opening statement, rather than the indictment—as Defendant contends—the government did not present a materially different theory in its opening. It simply stated that Defendant "told Mike Lane he would split that finder's fee, that commission Doppelmayr had promised him, *if Lane would do something*, if Lane would change his report, *if Lane would go back to the ski area and say it isn't safe*." Vol. V. At 112:4-7 (emphasis added).

12